[Civ. No. 16387. Fourth Dist., Div. One. Mar. 8, 1978.]

In re ANTONIO F. et al., Minors.
HOMER E. DETRICH, as Director, etc., Petitioner and Respondent, v.
MARIA F., Objector and Appellant.

[Civ. No. 16652. Fourth Dist., Div. One. Mar. 8, 1978.]

In re MARIA F., on Habeas Corpus.

## COUNSEL

Donald L. Clark, County Counsel, D. Richard Rudolf and Lloyd M. Harmon, Jr., Deputy County Counsel, for Petitioner and Respondent.

William R. Meyer and Steven B. Bassoff for Objector and Appellant.

## OPINION

**STANIFORTH, J.**—Petitioner, Homer E. Detrich, as Director of the San Diego County Department of Public Welfare, a licensed adoption agency, sought to have the minors, Antonio F., Maria G. F., Eligio F., and Leticia F., declared free from parental custody and control of their

mother, Maria F. Detrich's petition, for statutory authority, relies upon Civil Code section 232, subdivisions (a)(2), and (a)(7).[1]

The mother appeared and opposed the petition. After hearing, the superior court granted the petition based upon Civil Code section 232, subdivisions (a)(2) (neglect) and (a)(7) (inadequacy of parental relation). The court referred the children to petitioner's agency for adoptive placement. The mother appeals.

By a post-judgment order, the adoption proceedings were stayed until further order of the court. (Code Civ. Proc., § 917.7.). The mother has, since her appeal, petitioned this court for writ of habeas corpus after denial of a similar petition in the superior court. Her petition has been consolidated with this appeal. We therefore consider the issues raised on appeal and by the writ process.

## FACTS

Maria F. is the mother of eight children. She is a Mexican national subject to deportation to Mexico. The four minor children, objects of the petition, are Antonio F., born June 13, 1966 in Allentown, Pennsylvania; Maria G. F., born December 12, 1967, birthplace unknown; Eligio F., born February 13, 1969 in Chicago, Illinois; and Leticia F., born February 6,

---

[1]Civil Code section 232, subdivisions (a)(2), and (a)(7) provide:

"(a) An action may be brought for the purpose of having any person under the age of 18 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions:

"  . . . . . . . . . . . .

"(2) Who has been cruelly treated or neglected by either or both of his parents, if such person has been a dependent child of the juvenile court, and such parent or parents deprived of his custody for the period of one year prior to the filing of a petition praying that he be declared free from the custody and control of such cruel or neglectful parent or parents.

"  . . . . . . . . . . . . .

"(7) Who has been cared for in one or more foster homes under the supervision of the juvenile court, the county welfare department or other public or private licensed child-placing agency for two or more consecutive years, providing that the court finds by clear and convincing evidence that return of the child to his parent or parents would be detrimental to the child and that the parent or parents have failed during such period, and are likely to fail in the future, to

"(i) Provide a home for said child;

"(ii) Provide care and control for the child;

"(iii) Maintain an adequate parental relationship with the child; and

"(iv) Maintain continuous contact with the child, unless unable to do so.

"Physical custody of the child by the parent or parents for insubstantial periods of time during the required two-year period will not serve to interrupt the running of such period."

1970, in Reading, Pennsylvania. The father, Emeterio F., is a Mexican national also subject to deportation. The father abandoned the mother and the eight children in 1970 in Reading, Pennsylvania, and departed to Mexico. Shortly thereafter he returned to the mother and children in Reading only to desert them again after a brief, stormy session.[2] The mother was hospitalized as a result of the violence by her husband. The children were left without warm clothing during a cold Pennsylvania winter. According to the Berks County, Pennsylvania, probation officer, Maria F. felt "at the end of her rope." The Berks County Children's Service assisted in the placement of four of the children out of the home for a short period of time "until she felt more able to cope." After the short stay out of the home the children were returned to their mother in June 1971. Then, according to the Pennsylvania probation officer's report, "matters improved" until the United States Department of Immigration by letter notified the mother the family would have to be out of the United States by October 15, 1971. Maria F. responded to this "news" by departing Reading, Pennsylvania, with her eight children. She came to San Diego, California, where she left the children in the care of their aunt, Mrs. Teresa Salazar (sister-in-law of Maria F.). Mrs. Salazar kept the children at her home in San Diego and under her care and control from October 1971 to mid 1976. There was no evidence before the superior court from which to conclude that the leaving of the children in the Salazar home was anything but a safe and healthful placement until mid-1976. The juvenile court and the probation officer of San Diego County approved and reapproved of this placement of the children for nearly five years.

Mrs. Salazar applied for and received public monies for the support of these children in the fall of 1971. She continued to receive public monies for their support until her incarceration in mid 1976. Mrs. Salazar was then interviewed by the probation officer in the San Diego County jail where she was spending 120 days for shoplifting—and faced a further sentence in the United States District Court in San Diego for marijuana smuggling. Mrs. Salazar stated she had not heard from the mother or the

---

[2]The original petition filed February 19, 1976, named both the father and the mother and alleged Civil Code section 232, subdivisions (a) (1) (abandonment) and (a)(2) (neglect) as the basis for the free from custody proceedings. The father was notified but did not appear. The mother's whereabouts was discovered July 21, 1976. On July 22, 1976, judgment was entered against the father with regard to the four minors here. The proceedings were continued as to the mother and a further petition filed (September 15, 1976) alleging, as the additional ground, inadequacy of the parental relationship, placement of the children in foster care homes for more than two consecutive years. (Civ. Code, § 232, subd. (a)(7).)

father of the eight children since October 1971. She stated she had received no monies, no support whatsoever, from either of the parents.

The uncontradicted facts before the superior court are these: Maria F. paid Mrs. Salazar "installment payments for the support and maintenance of her children from 1971 through 1976," for a total of $7,421. Some $800 of the 1976 payments (March) was paid to Mrs. Salazar for airplane transportation of the children to visit their mother in Reading, Pennsylvania. Maria F.'s address in Reading, Pennsylvania, appears on the face of many of the monthly installments paid, money orders, American Express drafts sent to Mrs. Salazar. Evidence is further without contradiction (telephone company records) of numerous phone calls made over the years from the mother to the children. These uncontroverted facts lead to these conclusions: Mrs. Salazar was receiving money regularly from the mother for the support of these children; the mother was in frequent communication with the children over the entire five-year period Mrs. Salazar was asserting to the contrary to the probation officers and Juvenile Court of San Diego County.

Upon Mrs. Salazar's application for and obtaining welfare aid for the children in the fall of 1971, the Department of Public Welfare referred the case to the probation department whereupon a petition was filed (January 13, 1972) in the juvenile court asking that all the children (except Emeterio F., Jr.) be declared "dependent children" pursuant to section 600, subdivision (a), of the Welfare and Institutions Code.[3]

On February 15, 1972, the seven minors were made dependent children of the juvenile court. In December 1974 Emeterio F., Jr., was alleged and found to be a dependent child under Welfare and Institutions Code section 600, subdivision (a). The seven children were placed with Mrs. Salazar by court order dated February 15, 1972. Their placement in Mrs. Salazar's home was continued and confirmed annually until March 26, 1976, when the juvenile court found the Salazar home no longer available and the children were thereupon placed in licensed foster homes. Maria F. did not receive notice as to any of the

---

[3]Former Welfare and Institutions Code section 600, subdivision (a), provided:

"Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court.

"(a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising such care or control, or has no parent or guardian actually exercising such care or control."

Welfare and Institutions Code section 600, subdivision (a), proceedings or annual review proceedings. Only after the filing of this free from custody petition and questions directed to the children and answers received concerning the whereabouts of the mother did Maria F. receive notice of these proceedings.

Maria F. contends (both in her habeas corpus proceedings and on her appeal) the juvenile court did not acquire jurisdiction over the children in the 1972 and 1974 proceedings without service of process upon, notice to her, the mother. The statutory requirements of notice applicable to Welfare and Institutions Code section 600 proceedings are found in Welfare and Institutions Code section 656, which provides in pertinent part:

"A petition to commence proceedings in the juvenile court to declare a minor a ward or a dependent child of the court shall be verified and must contain:

". . . . . . . . . . . . . . . . . .

"(e) The name or names and residence address, if known to petitioner, of all parents and guardians of such minor. If there is no parent or guardian residing within the State, or if his place of residence is not known to petitioner, the petition must also contain the name and residence address, if known, of any adult relative residing within the county, or, if there be none, the adult relative residing nearest to the location of the court." and Welfare and Institutions Code section 658 which provides: "Upon the filing of the petition, the clerk of the juvenile court shall issue a notice, to which shall be attached a copy of the petition, and he shall cause the same to be served upon the minor, if the minor is 14 or more years of age or, in a case in which the minor is alleged to be a person described in Section 601 or 602, if the minor is eight or more years of age, and upon each of the persons described in subdivision (e) of Section 656 whose residence addresses are set forth in said petition and thereafter before the hearing upon all such persons whose residence addresses become known to the clerk. If the petition alleges that the minor is a person described in Section 601 or 602 the clerk shall issue a copy of the petition, to the minor's attorney and to the district attorney, if the district attorney has notified the clerk of the court that he wishes to receive such petition, containing the time, date, and place of the hearing."

Detrich asserts no notice was in fact ever sent to Maria F. because it was "impossible" to determine the mother's residence address in December 1971 or any time thereafter until mid-1976. Inquiries were made of the welfare authorities and the immigration authorities both in California and Pennsylvania. A letter received from the Berks County Pennsylvania Board of Public Assistance gave the last known address. A letter was sent to the father, Emeterio, at his last known address. However, no letter, no notice of pre-1976 proceedings, for reasons yet unexplained, was sent to the mother at her last known address. Maria F. has been living, working, in Reading, Pennsylvania, since her return from California in 1971. The social worker assigned to the children's case states the file shows Mrs. Salazar and the children, from the first contact December 1971 through July 21, 1976, denied having any knowledge of the whereabouts of either parent or that they had received any communication from either of them since October 1971.

■ The statutory duties (Welf. & Inst. Code, § 658) imposed upon the clerk of the juvenile court to give notices to "each of the persons described in subdivision (e) of Section 656 whose residence addresses are set forth in said petition" does not set forth the full measure of the due process where a Welfare and Institutions Code section 600, subdivision (a), proceeding is undertaken. ". . . the section 600 petition is in a sense brought against the parents to deprive them of a valued right." (*Lois R. v. Superior Court,* 19 Cal.App.3d 895, 901 [97 Cal.Rptr. 158].) "The parental right to have children and to the custody of those children is included among the liberties protected by the due process clause." (*Ibid.*) The parent cannot be deprived of custody without the essential ingredients of due process which includes " 'notice of a hearing to the proper parties.' " (*In re Gault,* 387 U.S. 1, 19, fn. 25 [18 L.Ed.2d 527, 541, 87 S.Ct. 1428, 1439].)

The California Supreme Court in *In re B. G.,* 11 Cal.3d 679, 688-689 [114 Cal.Rptr. 444, 523 P.2d 244], speaks to the precise question here; to wit: the nature of the process due, the notice requirements in a Welfare and Institutions Code section 600, subdivision (a), proceedings where the whereabouts of a parent is unknown the Supreme Court stated:

"Since the interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations], the state, before depriving a parent of this interest, must afford him adequate notice and an opportunity to be heard. [Citations.] In the present matter, the probation department

either knew the address of the mother, or knew that it could obtain that address from the grandparents. Yet it neither made such inquiry of the grandparents, nor exerted any effort to deliver notice to the mother through the Czech Embassy or through international organizations. Instead, presuming that the mother's whereabouts was unknown, the department eschewed reasonable efforts to find her and dispensed with any form of notice to her.

"We recognize that the department, faced with the task of notifying a resident of a foreign nation whose address may be uncertain, may be called upon to use unconventional forms of notice which may not always succeed in apprising the party of his opportunity to appear [citation]. But total absence of notice in any form cannot comport with the requirements of due process. [Citations.]"

*In re B. G.* rests for its due process conclusions upon *Mullane* v. *Central Hanover Tr. Co.,* 339 U.S. 306, 314-315 [94 L.Ed. 865, 873-874, 70 S.Ct. 652, 657]. The United States Supreme Court there stated: " 'The fundamental requisite of due process of law is the opportunity to be heard.' [Citation.] This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.

"The Court has not committed itself to any formula achieving a balance between these interests in a particular proceeding or determining when constructive notice may be utilized or what test it must meet. Personal service has not in all circumstances been regarded as indispensable to the process due to residents, and it has more often been held unnecessary as to nonresidents.

". . . . . . . . . . . . . . . . . . . .

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations.] The notice must be of such nature as reasonably to convey the required information, [citation], and it must afford a reasonable time for those interested to make their appearance, [citations].

". . . . . . . . . . . . . . . . . . . .

*"But when notice is a person's due, process which is a mere gesture is not due process.* The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected, [citations]." (Italics added.)

And finally, at page 317 [94 L.Ed. at page 875, 70 S.Ct. at page 658] the Supreme Court concluded: "This Court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning. Thus it has been recognized that, in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights."

So fundamental an ingredient of due process cannot be spared or left to the "favor or grace" of the notice requirements of Welfare and Institutions Code sections 656 and 658.

For guidance in resolving this question, we examine, for analogy, the free from custody proceeding under Civil Code section 232. Section 235 of the Civil Code authorizes the issuance of a citation upon the filing of the Civil Code section 232 petition. Subdivision (a) of Civil Code section 235 provides: "Such citation shall be served in the manner provided by law for the service of a summons in a civil action, other than by publication." Subdivision (b) provides: "If the father or mother of such minor person . . ., with reasonable diligence, be served as provided for in subdivision (a), or if his or her place of residence is not known to the petitioner, [an affidavit to that effect shall be filed and] [t]hereupon the court shall make an order that the service be made by the publication . . . ."

*In re Beebe,* 40 Cal.App.3d 643, 645 [115 Cal.Rptr. 322], reads due process requirements into Civil Code section 235 by reference to the statute covering service of summons by publication—Code of Civil Procedure section 415.50—and its requirement of exercise of "reasonable diligence." Said the *Beebe* court at page 645: "A literal application of the second quoted clause of section 235, however, could permit publication if petitioner merely states that he does not know the parent's place of residence, without any showing of the slightest effort to discover that address, or even if a petitioner had intentionally refrained from inquiry.

Finding one's address is a major element in any diligent effort to serve him personally. It is difficult to conceive of 'reasonable diligence' in attempting service without some diligence in seeking his address." The court further stated at pages 645-646: "We find no reason to require greater care in giving notice of an action for money or property than for one designed to deprive a party of his parental status. The parent has a constitutional right to notice of such a proceeding. [Citation.]"

We have heretofore recited the effort made to ascertain the whereabouts of Maria F. and her husband in early 1972 and before the February 15, 1972, Welfare and Institutions Code section 600, subdivision (a), proceedings. The facts lead to an inference of deceit practiced upon the probation officer and the juvenile court by Mrs. Salazar in her denial of knowledge of the whereabouts or contact with Maria F. However, this concealment does not excuse the total absence of any species of notice to Maria F. No letter was sent to the mother's last known address; there was no publication of citation. This lack of activity does not comport with requirements of due process.

The means employed to give notice "must be such as one, desirous of actually informing the absentee, might reasonably adopt to accomplish it." The attempts, the means here used, to ascertain the mother's address do not indicate a serious desire to locate her. Maria F. had lived, worked and raised her family in Reading, Pennsylvania for a number of years before leaving the children with Mrs. Salazar. She continued to work in a shirt factory, residing in Reading at all critical times here discussed. Sending a letter to her last known address in Reading, Pennsylvania, would be a minimal point of beginning of reasonable diligence to ascertain her whereabouts and to notify her. The actual efforts made to obtain the mother's address, contacting the welfare authorities in Berks County, Pennsylvania, and the immigration offices in San Diego, is at best minimal effort. It is to be likened more to a "mere gesture." We conclude the efforts made to locate Maria F. were not reasonably calculated to locate her and to apprise her of the pending action. There is no reason to approve less diligence and effort when giving notice in an action to deprive a parent of custody of a child than required in an action for money or property. No notice can be called reasonable which, prima facie, fails to afford an opportunity to appear. (*In re Pryor,* 68 Cal.App. 312, 316 [229 P. 60].) Maria F. was denied an indispensable element of due process; therefore the Welfare and Institutions Code section 600, subdivision (a), proceeding cannot be the

foundation for a free from custody proceeding under Civil Code section 232.

■ Turning now to the separate, further and distinct issues raised by the mother's appeal, we examine her contention of trial court error in declaring the four children free from her custody and control pursuant to Civil Code section 232, subdivision (a)(2) (parental cruelty or neglect).[4] The children were declared "dependent" children of the juvenile court by the February 15, 1972,and December 19, 1974, orders, finding them to be "person[s] described within section 600(a)" of the Welfare and Institutions Code; that is to say: "Any person under the age of 18 years . . . (a) Who is in need of proper and effective parental care or control and . . . has no parent or guardian actually exercising such care or control."

There was no allegation, no finding of parental cruelty or neglect (compare Welf. & Inst. Code, § 600, subd. (b), proceedings where such matters are in issue) by the juvenile court. We conclude the children met the statutory definition of section 600, subdivision (a), because there was no parent to care for them, not because they had been cruelly treated or neglected.

In *In re T. M. R.*, 41 Cal.App.3d 694 [116 Cal.Rptr. 292], two children were declared free from custody and control pursuant to Civil Code section 232, subdivision (b), the predecessor of section 232, subdivision (a)(2). The appeals court reversed the finding of neglect of the children for more than a year stating at page 700: "It is evident that subdivision (b) was intended to apply only in a situation where a child was made a dependent of the juvenile court because he was cruelly treated or neglected by his parents. Obviously no such situation exists in the instant case, since defendant's children were made dependent children of the juvenile court under section 600, subdivision (a), of the Welfare and Institutions Code, simply because there was no one to care for them when their parents were arrested. The record contains no evidence of

---

[4]Civil Code section 232, subdivision (a)(2), provides:

"(a) An action may be brought for the purpose of having any person under the age of 18 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions:

"  . . . . . . . . . . . .

"(2) Who has been cruelly treated or neglected by either or both of his parents, if such person has been a dependent child of the juvenile court, and such parent or parents deprived of his custody for the period of one year prior to the filing of a petition praying that he be declared free from the custody and control of such cruel or neglectful parent or parents."

cruelty or neglect on the part of defendant before she was deprived of custody of her children."

There is a similar lack here. A 1972 probation report recites the dire need of the family in the 1970-1971 period after the father had deserted. The children were going to school that winter without warm clothing. Maria F. was unemployed, had no coal for the furnace and no food in their house. In these circumstances, Maria F. consented to the temporary placement out of the home of her four children. The children were shortly thereafter returned to her. No inference of parental cruelty or neglect arises from these facts. The trial court found the "neglect" by virtue of Maria F. leaving the children with their paternal aunt, Mrs. Salazar. This conclusion is untenable, is rebutted in light of the fact setting here.

"The question of neglect, within the meaning of subdivision (b) [Welf. & Inst. Code, § 600], is rebutted by leaving the child in an environment where he is known to be getting good care." (*In re T. M. R., supra,* 41 Cal.App.3d 694, 700-701.)

The probation officer's report of May 15, 1972, states "the aunt continues to provide good care for the children." The placement was reviewed annually by the juvenile court and found satisfactory until the March 1976 hearing. The officers were laudatory of the aunt's care until 1976. Further, the facts are uncontradicted of regular monthly financial support of the children by their mother and frequent contact by telephone with the children by the mother. We conclude: a finding of neglect, if it had been placed in issue by an appropriate Welfare and Institutions Code section 600, subdivision (b), allegation, was not supported by the evidence nor by the law.

■ Maria F. finally urges trial court error in declaring the children free from her custody and control on the grounds they were cared for in "[a] foster home[s] . . . for two or more consecutive years . . . ."[5] (Civ. Code, § 232, subd. (a)(7).)

----

[5]Civil Code section 232, subdivision (a)(7) then authorized a free from custody order for a person:

"Who has been cared for in one or more foster homes under the supervision of the juvenile court, the county welfare department or other public or private licensed child-placing agency for two or more consecutive years, providing that the court finds [beyond a reasonable doubt] that return of the child to his parent or parents would be detrimental to the child and that the parent or parents have failed during such period,

Civil Code section 232, subdivision (a)(7), must be read and interpreted in the light of statutes dealing in the same subject matter (*Beasley* v. *Municipal Court,* 32 Cal.App.3d 1020, 1027 [108 Cal.Rptr. 637]) and harmonized with the whole system of law of which it is a part (*Morrison* v. *Unemployment Ins. Appeals Bd.,* 65 Cal.App.3d 245 [134 Cal.Rptr. 916]). Conformable to these familiar rules of construction we note Welfare and Institutions Code section 11251 authorizes aid and services for children placed in foster homes pursuant to section 232, subdivision (a)(7). Therein subdivision (b) foster care is defined as: "For purposes of this chapter, *'foster care' means care other than in the home of his parent or relative,* as these terms are used in Title IV of the Federal Social Security Act." (Italics added.)

Title IV, section 408 of the federal Social Security Act (42 U.S.C.A. § 608) provides in pertinent part: "For purposes of this section, the term 'foster family home' means a foster family home for children which is licensed by the State in which it is situated or has been approved, by the agency of such State responsible for licensing homes of this type, as meeting the standards established for such licensing; and the term 'child-care institution' means a nonprofit private child-care institution which is licensed by the State in which it is situated or has been approved, by the agency of such State responsible for licensing or approval of institutions of this type, as meeting the standards established for such licensing."

The California statutory scheme for state-licensed foster homes and its interrelation to Civil Code section 232, subdivision (a)(7), is to be found in Welfare and Institutions Code sections 11251, 11450, 11500-11501, 16000-16018, and Health and Safety Code sections 1500-1565.

The placement of these four children was with a relative, the paternal aunt, not in a foster home as defined in title IV of the federal Social Security Act and interrelated California statutes. Welfare and Institutions Code section 11251 specifically excludes a child residing with a relative from the definition of foster care. We conclude Civil Code

---

and are likely to fail in the future, to
"(i) Provide a home for said child;
"(ii) Provide care and control for the child;
"(iii) Maintain an adequate parental relationship with the child; and
"(iv) Maintain continuous contact with the child, unless unable to do so.
"Physical custody of the child by the parent or parents for insubstantial periods of time during the required two-year period will not serve to interrupt the running of such period."

section 232, subdivision (a)(7), does not factually apply here. It does not authorize a free from custody order where the placement has been in a home not within the definition of Welfare and Institutions Code section 11251, subdivision (b).

The failure to acquire jurisdiction of Maria F. in the 1972 and 1974 Welfare and Institutions Code section 600, subdivision (a), proceedings and the lack of factual or legal grounds for a free from custody order under either Civil Code section 232, subdivision (a)(2) or (a)(7), requires reversal and remand to the superior court for proceedings consistent with this opinion.

Judgment reversed.

Brown (Gerald), P. J., and Cologne, J., concurred.

A petition for a rehearing was denied March 24, 1978, and respondent's petition for a hearing by the Supreme Court was denied May 18, 1978.