[Civ. No. 18097. Third Dist. May 29, 1980.]

In re SARAH H. et al., Minors.
FOREST W. RICHARDS et al., Petitioners and Respondents, v.
JAMES H., Objector and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Judith W. Allen, Deputy State Public Defender, for Objector and Appellant.

Norris M. Goodwin for Petitioners and Respondents.

OPINION

**PARAS, J.**—The father (henceforth James) of two minors appeals from a judgment declaring them free of his custody and control. (Civ. Code, § 232.) The proceeding was initiated by the minors' maternal grandparents who have cared for the children since the death of their mother in May 1975. The mother's death was caused by a beating administered by James in the presence of the children, who were then aged three and one.[1]

James was arrested on May 27, 1975, and released on bail. He had been drinking for several hours prior to the homicide and assertedly had no recollection of the events of the evening. On September 4, the juvenile court denied him visitation of the children pending resolution of the homicide charge, and transferred custody to the grandparents. On September 13, James was arrested for another homicide following a shooting in a Plumas County bar; he was convicted by a jury of involuntary manslaughter and use of a deadly weapon on that charge and conviction was affirmed on appeal by this court. (3 Crim. 8707.) He was also convicted of voluntary manslaughter regarding the death of his wife after a plea of nolo contendere. He was incarcerated at the time of the trial court's hearing in this matter and his release date was uncertain.

Letters of guardianship were issued to the grandparents on December 26, 1975, and the present petition was filed by them on July 1, 1977. The petition alleged James cruelly treated and neglected both children by killing their mother, and that he was thus an unfit parent. After a series of delays and continuances, the matter was heard on June 19 and

---

[1]Sarah was born August 9, 1972; she was four when the petition was filed and is now seven. Matthew was born May 8, 1974; he was three when the petition was filed and is now five.

on July 26, 1978. The court received testimony from the grandparents, James, two correctional officers then supervising James, four teenage children of James by a previous marriage, and James' present wife. It then announced its intention to declare the minors free of parental control and custody pursuant to Civil Code section 232, subdivisions (a)(1) (abandonment),[2] (a)(2) (cruel treatment or neglect), (a)(4) (felony conviction), and (a)(7) (foster care for two or more years).[3] The court also found that a custody award to the father would be detrimental beyond a reasonable doubt[4] to the children and that an award to a nonparent was required to serve their best interests. (Civ. Code, § 4600.) Judgment was entered accordingly on September 26, 1978.

James contends there was insufficient evidence to support the trial court's findings under any of the subdivisions of Civil Code section 232, or the finding of detriment pursuant to Civil Code section 4600. He also contends the court's failure to consider appointment of counsel for the children resulted in a miscarriage of justice and requires reversal. We affirm the judgment on the basis of the evidence supporting the Civil Code section 232, subdivision (a)(4) finding, the finding of detriment under Civil Code section 4600, and the harmlessness of any possible error in the failure to appoint counsel for the children.

It is true that uxoricide is not per se a basis for termination of parental rights. (*In re James M.* (1976) 65 Cal.App.3d 254, 265-266 [135 Cal.Rptr. 222].) The statute provides that *any* felony can be the basis for termination if the facts of the crime "are of such nature as to prove the unfitness of such parent...to have the future custody and control of the child." (Civ. Code, § 232, subd. (a)(4); *Adoption of D. S. C.* (1979) 93 Cal.App.3d 14, 26 [155 Cal.Rptr. 406] (armed burglary); *In re Geoffrey G.* (1979) 98 Cal.App.3d 412 [159 Cal.Rptr. 460] (voluntary manslaughter).) Our review of the evidence supporting the trial court's finding requires resolution of all factual matters, credibility, and conflicts in favor of the prevailing party. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].) The

[2]This ground was not alleged in the petition, although there was testimony as to lack of communication by the father at the hearing.

[3]This ground was not alleged in the petition and is unsound since the grandparents' home was not a foster home. (See *In re Antonio F.* (1978) 78 Cal.App.3d 440, 452-454 [144 Cal.Rptr. 466].)

[4]The trial court went beyond the standard required by the Legislature, which is "by clear and convincing evidence," not "beyond a reasonable doubt." (See Civ. Code, § 232, subd. (a)(7).) Our concurring brother errs in his statement to the contrary (see conc. opn., *post* p. 330).

evidence before the trial court showed that James had two previous criminal convictions associated with the excessive use of alcohol, was intoxicated when the mother was beaten, administered the fatal beating in the presence of the two children, and killed a man in a bar four months later. The probation report prepared for the court recommended grant of the petition; a diagnostic study and the probation reports for the two homicides indicated alcohol-induced violence was consistent with the father's character. Given these facts, we shall not say the conclusion of unfitness was unsupported.

There is also sufficient evidence to support the court's finding that parental custody would be detrimental to the children, and their best interests require nonparental custody. The determination is one to be made as of the time of the hearing. (*In re James M., supra*, 65 Cal. App.3d at p. 265.) There was testimony showing that Sarah was still suffering ill effects from witnessing the beating; she was afraid of blood, afraid to sleep alone, and skeptical of strangers. Matthew no longer recognized James and was happy and well adjusted in the only home he has ever really known (he lived with his father for only six months). Given this and the circumstances of the mother's death, the trial court could reasonably conclude that the probability of recurrence of alcohol-induced violence by James posed a threat to the children's mental and/or physical well being should he regain custody.

 Finally, any error in the court's failure to consider the appointment of counsel for the children (Civ. Code, § 237.5; *In re Richard E.* (1978) 21 Cal.3d 349 [146 Cal.Rptr. 604, 579 P.2d 495]; *In re Dunlap* (1976) 62 Cal.App.3d 428 [133 Cal.Rptr. 310]), was harmless. The central issue in the case was James' fitness to retain parental rights; it was not a close question and was properly determined by the trial court. There was no miscarriage of justice. (*In re Richard E., supra*, at p. 355.)

The judgment is affirmed.

Regan, Acting P. J., concurred.

**REYNOSO, J.**—I concur in the result. The trial court did what it thought best in the context of the present state of the law. It is the state of the law, when viewed from a constitutional perspective, which concerns me.

Two principal considerations cause me to concur. First, the trial judge applied the appropriate standard of proof—beyond a reasonable doubt and to a moral certainty. That standard of proof is required by the importance of the interest with which we deal—the interest of the father in a continued relation with his children, and the interest of the children in continuing a relationship with the father. (See *Meyer* v. *Nebraska* (1922) 262 U.S. 390 [67 L.Ed. 1042, 43 S.Ct. 625, 29 A.L.R. 1446]; *Griswold* v. *Connecticut* (1965) 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678]; *Alsager* v. *District Court of Polk Cty., Iowa* (S.D.Iowa (1975) 406 F.Supp. 10).) Few interests in life can be more dear. Second, the trial court was well advised by the various parties who had an interest in the outcome of this proceeding. James and his new wife were present and testified. His new wife, a widow of many years acquaintance, is described by exhibits found in the record as a moral and devoted mother. The putative adoptive parents, the grandparents of the children, testified. Children by a previous marriage also appeared as witnesses. The county officials presented their reports. Other witnesses added to the court's understanding of the father's strengths and weaknesses. Many exhibits were introduced. However, two very important persons were neither present nor represented—the two children involved. Their interests are so intimately affected that absent controlling authority (see *In re Richard E.* (1978) 21 Cal.3d 349 [146 Cal.Rptr. 604, 579 P.2d 495]), I would have said the absence was procedurally fatal. Certainly, representation of the children's interest should be the rule. Nonetheless, on this record I am satisfied the trial court had as good a notion about the children as possible, absent their presence or representation.

The trial court ruled that the entirety of the bundle of rights a father possesses must come to an abrupt end. The children, too, lose all rights to moral and financial support from the father. Yet, the record is replete with evidence that the father had been a good father to all his children. The testimony of the older children showed his interest in being a good father. After his arrest, his first concern was about the children. The diagnostic study and evaluation by the California Department of Corrections fairly summarizes the record: "James [H] is a 40-year-old man who has made a reasonable, conforming adjustment to societal and family responsibilities until involved in the present matter. He is an emotionally rigid, proud man who displayed a strong sense of obligation to family (including father and siblings) and moral responsibility. [¶] Available collateral information suggests [H] is a totally conforming person until he starts to drink at which time he becomes ag-

gressive, as in the present tragedy. Circumstances of this offense tend to indicate that [H's] behavior is totally unpredictable when under the influence of alcohol and his insight into this aspect of his personality is extremely limited." At all times, James was a good worker, a cowboy and ranch hand. He exemplifies in real tragic life, the movie and television ideal of a hard-drinking ranch hand who settles disputes by force.

The decision for the trial court, taking all the above into account, could not have been an easy one. In my view, the case is close. Nonetheless, I cannot say the trial court abused its discretion. James has a serious problem. He is described as a man of narrow mind and strong social and racial prejudices. More seriously in terms of the case at bench, he suffered from a dangerous drinking problem. The case of *In re James M.* (1976) 65 Cal.App.3d 254 [135 Cal.Rptr. 222], was called to the trial court's attention. There, the father, against whom Civil Code section 232 proceedings were instituted, had knifed his wife to death—21 puncture wounds were found. He was convicted of second degree murder. The record revealed a father who had suffered several suicide attempts and had deep emotional problems. The emotional problems and the crimes involved were more serious than in the case at bench. Yet, the court described the crime as one of passion, pointed to the father's devotion to the welfare of the children, and affirmed a trial court Civil Code section 232 determination favorable to the father. In the case at bench, James was convicted of manslaughter, not murder, but the killing in the case at bench, unlike *James M.*, was in the presence of the children, a circumstance noted by the *James M.* court as material on the issue of unfitness. More basic, however, is that the *James M.* court simply ruled, as noted by the majority, that uxoricide does not as a matter of law form the basis for termination of parental rights. In the case at bench, we rule simply that uxoricide is manifestly an important factor which the trial court may consider together with other factors.

The above summary of the father's circumstances, in my view, gives rise to this perplexing question: can the present legislative scheme be squared with the constitutional substantive due process rights possessed by father and children? Questions abound: (1) Was it to the best interest of the children to lose the father's obligation to support them? Need an adoption necessarily mean a loss of that right? (2) Was the father so dangerous that he could not even visit with the children and keep some relationship alive? Need an adoption necessarily terminate all visitation rights? (3) Cannot the children be given the stability they need without

a breach of other important familial rights? The legislative scheme under which trial judges labor tends to take an all-or-nothing approach to these problems. As the appellate courts face the constitutional issues of familial rights, it is not at all clear that the present legislative approach will pass constitutional muster. We need not face those issues in the case at bench. Because of the alcohol-related dangers, the brutal slaying in the presence of the children, and the children's need for stability, I cannot say the trial court erred, as a matter of law, in terminating parental rights.

Appellant's petition for a hearing by the Supreme Court was denied July 23, 1980.