Filed 7/6/21  In re M.B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.B., a Person Coming Under the Juvenile Court Law. | |
| ADAM W. et al, | D078382 |
| Plaintiffs and Respondents, | (Super. Ct. No. A63458) |
| v. | |
| ERIC B., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Edlene C. McKenzie, Judge.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Yelman & Associates and Sara R. Neuman for Plaintiffs and Respondents.

Julie E. Braden, under appointment by the Court of Appeal, for Minor.

Adam W. is M.B.'s stepfather and Eric B. is her biological father. Adam filed a petition for freedom from parental custody and control (the petition) seeking to terminate Eric's parental rights under Family Code[1] sections 7822 and 7825 based on Eric's abandonment of M.B. and two felony convictions for child abuse relating to M.B. After conducting an evidentiary hearing, the trial court granted the petition. Eric appeals, arguing that he did not intend to abandon M.B. and that his felony convictions do not prove his unfitness as a parent. We conclude that the trial court did not abuse its discretion and affirm the order granting the petition.

FACTUAL AND PROCEDURAL BACKGROUND

*Background*

Eric married M.B.'s mother, Rosa C-W., in December 2008. During her pregnancy with M.B., Eric became physically aggressive toward Rosa for the first time. The couple argued about Eric's drinking while Eric was drunk. Eric punched walls, slammed doors, threw a television at Rosa, and locked her outside the home at night in the rain. Rosa gave birth to M.B. in February 2015. After M.B.'s birth, Rosa reported that Eric's drug and alcohol abuse became worse and that he drank almost daily. In July 2015, Eric, while under the influence, kicked Rosa and grabbed her by the wrists after an argument.

In October 2015, when M.B. was eight months old, the couple separated. Because Rosa feared Eric, she secretly found a place to live and moved out while Eric was away on a business trip. Eric threatened his own brother and his brother's family after Rosa moved out, prompting the brother

---

[1]     Undesignated statutory references are to the Family Code.

2

to seek a restraining order against Eric. By October 2016, the parents had a formal visitation schedule giving Rosa primary custody of M.B. and Eric visitation.

On January 1, 2017,[2] Rosa filed a police report to document that Eric had assaulted her. On January 5, Rosa obtained a temporary restraining order against Eric. The order did not include M.B. and Eric continued to have weekly visitation. On January 19, Rosa contacted the police after Eric took M.B. out of daycare, refused to meet at the agreed-upon exchange location, and sent Rosa angry texts in violation of the restraining order. On February 6, the family court issued a permanent restraining order protecting Rosa from Eric.

On April 7, the family court ordered Eric to pay Rosa $896 in monthly child support and 50 percent of monthly childcare and insurance costs. The court also ordered him to make monthly arrearage payments. Eric paid the monthly child support until September 2018 but did not pay half of the childcare costs or health insurance.

On September 10, Rosa went to a court designated exchange location to pick up M.B. Eric arrived in his truck an hour late, intoxicated, and with M.B. not wearing a seatbelt. After a verbal exchange, Eric threw M.B. toward Rosa, threw the child's belongings in the street, and pushed Rosa into oncoming traffic as she held M.B. Eric left but was later arrested. Eric suffered three felony convictions arising out of the incident,[3] including corporal injury to a spouse (Pen. Code, § 273.5, subd. (a)), and two counts of

---

[2]     Undesignated date references are to 2017.

[3]     We refer to the September 10 confrontation between Eric and Rosa as "the incident."

child abuse likely to produce great bodily injury (Pen. Code, § 273a, subd. (a)).[4]

Rosa and M.B. sustained physical injuries when they hit the ground. M.B. developed a stutter after the incident and displayed signs of emotional trauma, including fear of males. On September 13, 2017, Rosa obtained a restraining order requiring no contact between Eric and M.B. Eric has not seen or communicated with his daughter since this date.

The criminal court sentenced Eric to the Department of Corrections for two years. The court also issued two criminal protective orders against Eric naming Rosa and M.B. as the protected persons. The criminal protective order issued for M.B. expressly allowed Eric to petition the family court for orders that would allow him to contact M.B. Later that month, the family court finalized the couple's divorce. The couple's marital settlement agreement (MSA) incorporated the no-visitation provision from the family court restraining order. Eric started serving his prison sentence in September 2018 and spent approximately 13 months in prison, or through October 2019.

In the meantime, Rosa began dating Adam in April 2016 and they married in May 2019. M.B. identifies Adam as her father and calls him "daddy." Adam is the primary wage earner in the family and pays for most of

---

4     Eric also suffered four misdemeanor convictions including: disobeying a court order (Pen. Code, § 273.6, subd (a)); two counts of driving under the influence of alcohol (Veh. Code, § 23152, subd. (a)); driving while having a measurable blood alcohol over 0.08 percent (Veh. Code, § 23152, subd. (b)); and battery of a current or former significant other (Pen. Code, § 243, subd. (e)(1)).

M.B.'s living expenses, preschool tuition, and provides her with health insurance.

*The Petition and Trial*

In November 2019, Adam petitioned to terminate Eric's parental rights under section 7820 et seq. Although Eric had motions pending in family court regarding custody and visitation, the family court stayed these motions pending the outcome of the instant petition. An investigation was conducted pursuant to section 7851.[5] The court investigator concluded that Eric met the criteria for termination of parental rights based upon abandonment and his felony convictions, and that termination of Eric's rights would be in M.B.'s best interests.

In November 2020, the matter proceeded to trial with remote appearances given the ongoing state of emergency related to the COVID-19 pandemic. (Emergency rule 3(a).)[6] The court heard testimony from Eric, Adam, Rosa, and M.B.'s paternal grandmother and grandfather. The court

---

[5] Subdivision (a) of section 7851 provides that an investigator "shall render to the court a written report of the investigation with a recommendation of the proper disposition to be made in the proceeding in the best interest of the child." Subdivision (d) of section 7851 provides that "[t]he court shall receive the report in evidence and shall read and consider its contents in rendering the court's judgment."

[6] Emergency Rules, rule 3, of the Amendments to the California Rules of Court related to the COVID-19 pandemic provides courts with the latitude to "require judicial proceedings and court operations be conducted remotely," including by "the use of video, audio, and telephonic means for remote appearance . . . ." (Amendments to the Cal. Rules of Court, Emergency Rules, rule 3(a)(1) & (a)(3), adopted by the Judicial Council of Cal., eff. Apr. 6, 2020, <https://www.courts.ca.gov/documents/2020-04-06-rules-effective-04-06-2020.pdf> [as of July 1, 2021], archived at <https://perma.cc/42AF-5GQH>.)

also heard testimony from the licensed marriage and family therapist who prepared the section 7851 investigation report, Rosa's family attorney, Dr. Sonia Carbonell, M.B.'s treating psychologist, a licensed private investigator hired by Adam and Rosa, a probation officer who supervised Eric for the final five weeks of his postincarceration probation, and Dr. Raymond Murphy, a licensed psychologist who evaluated Eric in February 2020.

The trial court found, by clear and convincing evidence, that Adam met his burden of proof under sections 7822 and 7825 and granted the petition to terminate Eric's parental rights.[7] Eric timely appealed.

## DISCUSSION

### I. *GENERAL LEGAL PRINCIPLES*

The Family Code authorizes the termination of parental rights to facilitate the adoption of a child in certain circumstances. The purpose of terminating a parent's rights and freeing a child for adoption "is to serve the welfare and best interest of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from the child's life." (§ 7800.) A minor may be declared free from the custody and control of his or her parent under section 7822 if, as relevant here, "[o]ne parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (*Id.* at subd. (a)(3).)

---

[7] In its oral statement of decision, the court cited Adam and Rosa as petitioners. The written petition, however, lists Adam as the sole petitioner.

A proceeding to declare a child free from parental custody and control under section 7825 can be brought if the parent has been convicted of a felony and the facts of the crime "are of such a nature so as to prove the unfitness of the parent . . . to have the future custody and control of the child. In making a determination pursuant to this section, the court may consider the parent's criminal record prior to the felony conviction to the extent that the criminal record demonstrates a pattern of behavior substantially related to the welfare of the child or the parent's ability to exercise custody and control regarding the child." (*Id.* at subd. (a)(2).)

"The 'fundamental' nature of parental rights requires that there be clear and convincing evidence of the facts necessary to terminate such rights. [Citations.] This standard mandates ' "that the evidence be ' "so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " ' [Citations.] [¶] The decision to terminate parental rights lies in the first instance within the discretion of the juvenile court, and will not be disturbed on appeal absent an abuse of that discretion. [Citation.] . . . With respect to challenged factual findings, we will affirm 'if there is any *substantial* evidence to support the trial court's findings,' i.e., 'if the evidence is reasonable, credible and of solid value—such that a reasonable trier of fact could find that termination of parental rights is appropriate based on clear and convincing evidence.' " (*In re Baby Girl M.* (2006) 135 Cal.App.4th 1528, 1535-1536 (*Baby Girl M.*); see also *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 (*O.B.*) ["[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the [reviewing] court must determine whether the record, viewed as a whole, contains substantial

7

evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof."].)

"We review the record in the light most favorable to the trial court's order to determine whether there is substantial evidence from which a reasonable trier of fact could make the necessary findings based on the clear and convincing evidence standard." (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 694, italics deleted.) We do not evaluate "the credibility of witnesses, resolve conflicts in the evidence or determine the weight of the evidence." (*In re E.M.* (2014) 228 Cal.App.4th 828, 839.) It is the appellant's burden to show that the evidence is insufficient to support the trial court's findings. (*Ibid.*)

## II. *ANALYSIS*

The trial court concluded that Eric abandoned M.B. within the meaning of section 7822 and that Eric's felony convictions proved his unfitness to have future custody of M.B. within the meaning of section 7822. Substantial evidence supports the court's termination of Eric's parental rights under sections 7822 and 7825, under the clear and convincing standard of proof.[8]

### A. *Eric Abandoned M.B. within the Meaning of Section 7822*

Three main elements must be met to find abandonment: (1) the child must have been left with another; (2) without provision for support or without communication from the parent for the statutory period; and (3) with the intent on the part of the parent to abandon the child. (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1010 (*Allison C.*).) Abandonment and intent

---

[8] Although only one basis for terminating parental rights is required, we exercise our discretion to address all the trial court's findings under sections 7822 and 7825. (*In re Mark V.* (1986) 177 Cal.App.3d 754, 762 (*In re Mark V.*) [decided under predecessor statute].)

8

are questions of fact for the trial judge and the trial judge's decision, when supported by substantial evidence, is binding upon the reviewing court. (*Id.* at p. 1011.) "[T]he failure to provide support, or failure to communicate is presumptive evidence of the intent to abandon." (§ 7822, subd. (b).) A parent's incarceration does not, in and of itself, provide a legal defense to abandonment. (*Allison C.*, at p. 1012.)

"The parent need not intend to abandon the child permanently; rather, it is sufficient that the parent had the intent to abandon the child during the statutory period." (*In re Amy A.* (2005) 132 Cal.App.4th 63, 68.) "[A] parent will not be found to have voluntarily left a child in the care and custody of another where the child is effectively 'taken' from the parent by court order [citation]; however, the parent's later voluntary inaction may constitute a leaving with intent to abandon the child [citation]." (*In re Marriage of Jill & Victor D.* (2010) 185 Cal.App.4th 491, 505.)

### 1. *Failure to Communicate*

Eric contends that the September 13, 2017 family court restraining order prevented him from contacting M.B. and that he did not intend to abandon her. Eric testified that he had a request for order calendared for July 23, 2018 to modify visitation but the hearing did not go forward due to his criminal case and attorney delay. Eric started serving his prison sentence in September 2018 and spent approximately 13 months in prison.

Eric testified that during his incarceration his "hands were tied" regarding his ability to monitor M.B.'s well-being because of the protective orders preventing him from contacting M.B. He claimed that he did the best he could to stay in touch with M.B. by sending his mother letters asking about M.B. He claimed that he tried to change the criminal protective order and the family law order against him by asking his mother for his attorney's

9

telephone number or having his mother contact another attorney. He argues that his incarceration limited his ability to reach a family law attorney and that he lacked the resources to file a modification motion. When released from prison on November 17, 2019, he immediately filed a motion in family court requesting visitation, but the family court stayed the motion because of the instant litigation.

The trial court rejected Eric's argument that his incarceration prevented him from seeking modification of the no contact orders, finding that Eric "lacked credibility in most all relevant aspects." The court stated that Eric did nothing to demonstrate he desired contact with M.B. while incarcerated even though the criminal court order expressly authorized him to petition the family court for an order modifying the protective order against him. The record supports the trial court's conclusion that Eric abandoned M.B. by leaving her in Rosa's care and failing to communicate with her.

Adam's petition alleged that Eric failed to have any contact with M.B. since September 2017, a period of more than two years. While it is true that the September 13, 2017 family court restraining order prevented Eric from having any contact with M.B., this order expired on February 15, 2018. Instead of contesting the restraining order, Eric voluntarily agreed to incorporate the child custody and visitation provisions from the restraining order into his September 20, 2017 MSA with Rosa. The MSA, which Eric and Rosa negotiated with the assistance of counsel, referenced the restraining order and gave Rosa "sole legal and primary physical custody" with "no visitations" to Eric. Although Eric could have negotiated a different order, this provision supports the trial court's conclusion that Eric desired no contact with M.B.

Eric testified that he had a request for order calendared for July 23, 2018 to modify visitation, but Rosa's family law attorney testified that she was never served with such a motion. Rosa's family law attorney stated that although Eric filed a motion to modify child *support*, he did not file a motion to modify visitation. Eric provided no record citation showing he filed a motion to modify visitation before his incarceration and we have not located this motion in the record.

Eric admitted that during his incarceration he never filed any motions with the criminal court or family court to change the orders against him to allow contact with M.B., citing his lack of resources and limited ability to communicate. The evidence in the record, however, undercuts Eric's claim that his incarceration limited his ability to seek modification of the no contact orders. Eric testified that he had had access to a landline while incarcerated and could contact the paternal grandmother. The paternal grandmother confirmed Eric's testimony, stating that during Eric's incarceration she communicated with him several times a week by mail and telephone. She stated that Eric had the ability to call her and she had the ability to call him.

The paternal grandfather testified that he sent two or three letters each month to Eric in prison and that Eric communicated with him through letters. Eric, however, never asked for his assistance to change the no contact order. This testimony shows that Eric had the ability to seek modification of the no contact orders, but that he chose not to request a modification to allow contact with M.B. Accordingly, substantial evidence supports the family court's termination of Eric's parental rights under section 7822 based on his failure to communicate with M.B.

2. *Failure to Support*

11

The evidence also supports the trial court's conclusion that Eric failed to provide any financial support to M.B. during his 13-month incarceration. Rosa testified that in September 2018, Eric sent his last child support check and that Eric sent no child support checks during his incarceration from September 2018 through October 2019. Eric resumed paying child support in November or December 2019 and is currently paying $600 in monthly child support. Rosa believed Eric had the ability to pay child support during his incarceration because he receives income from rental property and money from a family trust.

At trial, Eric disputed Rosa's claim that he failed to pay child support during his incarceration. Eric admitted that he did not "directly" pay child support to Rosa but claimed that the paternal grandmother sent child support payments on his behalf. Eric claimed that he later reimbursed the paternal grandmother for child support payments that she made on his behalf by writing two checks, one for $27,032 and another for $5,000. The paternal grandmother similarly testified that she made Eric's child support payments during his incarceration. She also stated that Eric sent her checks for $27,032 and $5,000 as reimbursement for the child support payments that she made on his behalf.

The trial court found that Eric lacked credibility and that the paternal grandmother's testimony, as it related to her making payments for M.B. on Eric's behalf, also lacked credibility. Specifically, the trial court rejected their testimony that the two checks Eric wrote reimbursed the paternal grandmother for child support payments she made on his behalf. Instead the court found that Eric had repaid the paternal grandmother for paying his mortgage during his incarceration, noting that Eric's monthly mortgage was approximately $2,500 and multiplying this dollar amount by 13 (the number

12

of months Eric was incarcerated), equaled approximately $32,000, the value of the two repayment checks. As further proof that the paternal grandmother had not paid child support on Eric's behalf, the court noted the paternal grandmother's testimony that: (1) she paid M.B.'s tuition "as a grandmother"; (2) she wrote a letter detailing the payments she made to help Rosa and M.B. but never indicated in this letter that the payments were on Eric's behalf; and (3) a check she wrote purportedly on Eric's behalf contained a notation "specifically stat[ing] it was for a birthday, not for support."

We reject Eric's argument that the trial court erred in finding that he failed to financially support M.B. during his incarceration. As the trier of fact, the trial judge "is the sole judge of the credibility and weight of the evidence" and determines whether "a witness is to be believed or not believed." (*In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1099.) "In reviewing the trial court's decision, we do not replace the court's exercise of discretion with our own by accepting evidence the court rejected; we are required to uphold the judgment if any substantial evidence supports the court's decision, without consideration of whether there also exists substantial evidence to support [Eric's] position. The credibility of [Eric's] testimony and evidence was part of the court's decision and thus not for us to judge in the first instance." (*In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 319.)

By its ruling, the trial court expressly rejected Eric's and the paternal grandmother's testimony regarding child support payments and impliedly credited Rosa's testimony that Eric paid no child support during his

incarceration.[9] We are without power to substitute our deductions for the trial court's findings, particularly as the trial court had the benefit of live testimony and could evaluate the parties' demeanor. (*Escobar v. Flores* (2010) 183 Cal.App.4th 737, 749 ["we have nothing but the cold, unadorned words on the pages of the reporter's transcript"].) The record here contains substantial evidence by which the trial court could conclude, under the clear and convincing standard, that Eric failed to provide financial support within the meaning of section 7822, subdivision (b).

B. *Eric's Felony Convictions and Pattern of Behavior Established His Unfitness to Parent Within the Meaning of Section 7825, Subdivision (a)*

Section 7825 states in part: "(a) A proceeding under this part may be brought where both of the following requirements are satisfied: [¶] (1) The child is one whose parent or parents are convicted of a felony. [¶] (2) The facts of the crime of which the parent or parents were convicted are of such a nature so as to prove the unfitness of the parent or parents to have the future custody and control of the child. In making a determination pursuant to this section, the court may consider the parent's criminal record prior to the felony conviction to the extent that the criminal record demonstrates a pattern of behavior substantially related to the welfare of the child or the parent's ability to exercise custody and control regarding the child." The felony conviction must involve "egregious underlying facts that have a direct

---

9    Eric's ability to repay the paternal grandmother approximately $32,000 after his release from prison undercuts his testimony that he lacked the financial resources during his incarceration to seek modification of the restraining orders that prevented him from contacting M.B.

14

bearing on parental fitness. . . .” (*In re Baby Girl M.* (2006) 135 Cal.App.4th 1528, 1539 (*Baby Girl M.*).)

“[T]here must be a nexus between the decision to terminate parental rights under section 7825 and the *underlying facts* of a parent’s felony conviction.  This requirement of a nexus is not satisfied simply by the existence of a felony conviction or even the existence of multiple felony convictions absent evidence that the underlying facts of those convictions ‘prove the unfitness of the parent . . . to have the future custody and control of [his] child.’  [Citation.]  In so holding, we do not preclude consideration of other factors, such as an extensive criminal record, history of substance abuse, domestic violence, etc., which, in appropriate circumstances, can inform the court’s evaluation of the facts underlying a felony conviction or convictions.  Under section 7825, however, such factors can only *inform* that evaluation; they cannot themselves form the basis for termination.”  (*Baby Girl M.*, *supra*, 135 Cal.App.4th at p. 1542.)

“The court considers the circumstances of the felony to determine whether it is likely that *future harm* may result to the child if the parental rights are not terminated.”  (*In re Arthur C.* (1985) 176 Cal.App.3d 442, 445.) “Unfitness” under section 7825 means the “probability that the parent will fail in a substantial degree to discharge parental duties toward the child.” (*In re Christina P.* (1985) 175 Cal.App.3d 115, 133.)

Eric suffered three felony convictions arising out of the incident, which directly involved M.B., including two counts of child abuse likely to produce great bodily injury.  The facts of this incident included Eric driving M.B. while intoxicated and without a seatbelt to a court designated exchange location.  When Rosa accused Eric of driving while intoxicated, he “became angry and vulgar,” pulled M.B. out of the car and threw her toward Rosa who

15

caught her. After throwing M.B.'s belongings in the street, Eric pushed Rosa into oncoming traffic as she held M.B., causing a car to slam on its brakes.

Both suffered physical injuries after hitting the ground. As discussed in Part II.C., *post*, M.B. also suffered significant and long-lasting emotional injuries. Eric then drove away without checking on their welfare. Rosa made a video and audio recording of the incident, which lasted approximately nine minutes, where M.B. can be heard wailing in the background. Significantly, this incident occurred while Eric was subject to a permanent restraining order protecting Rosa from him.

Eric's callous and brazen actions toward his own child demonstrated an utter lack of empathy regarding how his actions would impact M.B. A fit parent would not put his own child in a situation that could have caused irreparable harm or even death.

At the request of Eric's attorney, Dr. Murphy conducted a psychological evaluation of Eric in February 2020 to assess Eric's propensity for violence and parenting ability. Eric tested "elevated to the point of concern" on his substance abuse assessment. Dr. Murphy believed this area required further evaluation and treatment intervention. Dr. Murphy opined that having an alcohol problem does not necessarily preclude someone from being a good parent, but qualified his answer by stating, "Only if—only if they won't get help." Although Eric tested average for aggression and anger, he had elevated scores related to his ability to control (1) verbal or physical expressions of anger and (2) "angry thoughts and perseveration thinking about angry impulses."

Regarding Eric's future parenting ability, Dr. Murphy opined that Eric had the "potential to perform adaptively in a stable fashion" but this opinion depended on Eric's ability to "maintain sobriety and be involved in

16

treatment." Dr. Murphy testified that Eric tended to blame others for his behavior. After Dr. Murphy testified regarding his belief that Eric "has done what he feels is the minimum to get by with his level of responsibility or whatever is required of him," Eric, who was attending the trial virtually, turned off his computer camera and texted his attorney that he had left the proceeding.

Dr. Murphy's testimony, combined with other evidence in the record, constitute "other facts from which a rational inference may be drawn that [Eric] will be unable to properly care for [M.B.] in the future." (*In re Terry E.* (1986) 180 Cal.App.3d 932, 953.) Before the incident, Rosa suffered domestic violence at Eric's hands that ultimately resulted in Rosa obtaining a permanent restraining order against him. Others have also suffered from Eric's intemperate behavior resulting in restraining orders, including Eric's own brother and an ex-girlfriend.

Additionally, Eric lied under oath. Eric initially stated that he had no prior criminal history before the incident, but then admitted to a prior driving under the influence conviction. Eric testified that he last used alcohol in 2018. He later testified that after being released from probation in October 2019, that he had one glass of wine on his birthday. A private investigator contradicted these claims with photographic evidence of Eric's continued alcohol use in 2020. On September 5, 2020, Eric rode his bike to a sushi restaurant where he drank three carafes of sake, with each carafe consisting of three alcoholic drinks. After biking home, the private investigator overheard Eric arguing with a woman inside the home about his drinking. He left the home and eventually went to another location where the investigator lost sight of him. Eric returned home and the investigator

17

heard more arguing, clinking of dishes, and slamming cupboards that lasted for about 15 minutes.

The following day, Eric left his home in the early afternoon, went to a store and drank two 16-ounce cans of alcoholic kombucha on the side of the road. Later that day, Eric went to a saloon and drank three alcoholic beverages. On November 21, 2020, a little over a week before trial, the investigator observed Eric driving a car around the neighborhood, and to several destinations including a cannabis store, where he left carrying with a small package.[10] That afternoon, the investigator followed him to a restaurant where Eric ordered pizza and had two glasses of wine. On this issue the trial court remarked, "It is deeply concerning that Eric is out drinking in the weeks leading up to his trial in which the court will decide whether his parental rights to his daughter should be terminated."

Notably, Eric validated some of Dr. Murphy's clinical conclusions during trial by demonstrating an inability to control his behavior during the court proceedings. At times, Eric demonstrated anger, annoyance, acted out, interrupted the proceedings, argued with the court, and left the proceedings. At one point, the trial judge took a five-minute recess to allow Eric "to speak with your counsel about the requirements of the [c]ourt and what the court expects when parties are before it. This is a civilized venue. The court expects for you to behave in a way that is respectful to the [b]ench and respectful to counsel."

---

[10] Eric testified that he did not have a driver's license and claimed that he was not currently driving.

18

In its oral statement of decision the court noted, "If Eric was unable to control his emotions in front of the judge who would determine whether his parental rights should be terminated, it does not stretch logic that his behavior in private when upset might be even more aggressive and inappropriate." The trial court also concluded that the evidence "strongly indicated that [Eric] has not changed; he has not accepted responsibility for any of his actions; he continues to engage in the same behaviors which led to his actions which resulted in his felony convictions" and that Eric's behavior made him unsuitable to parent M.B.

Eric relies on cases involving murder to argue that his felony convictions do not rise to the level of "egregious" conduct that would support a finding of unfitness under the statute. (*In re Sarah H.* (1980) 106 Cal.App.3d 326, 328-330 [father fatally beat mother in child's presence]; *In re Mark V.*, *supra*, 177 Cal.App.3d at p. 756 [father fatally stabbed mother while children slept]; *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420 [fatal strangulation of mother].) Eric, however, cited no authority that the crime must be murder to support a finding of unfitness under section 7825. Rather, the statute applies where a parent is convicted of "a felony" "of such a nature so as to prove the unfitness of the parent . . . to have the future custody and control of the child." (§ 7825, subd. (a)(1) & (2).) Nothing in the statute sets forth the type of crime required.

Here, Eric's felony convictions, especially when viewed with other evidence in the record, constitute substantial evidence under the clear and convincing standard that support the trial court's finding that Eric was unfit to have future custody and control of M.B. within the meaning of section 7825.

C.  *Substantial Evidence Supports the Trial Court's Finding that Terminating Eric's Parental Rights is in M.B.'s Best Interests*

19

Sections 7822 and 7825 do not reference the best interests of the child. Rather, this concept appears in section 7800, describing that the purpose of the freedom of parental custody and control statutes, including sections 7822 and 7825, is "to serve the welfare and best interest of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from the child's life." The statutory scheme is "liberally construed to serve and protect the interests and welfare of the child." (§ 7801.) Section 7890, contained in that part of the statutory scheme regarding the hearing, provides: "In a proceeding under this part, the court shall consider the wishes of the child, bearing in mind the age of the child, and shall act in the best interest of the child."

The best interests of a child are "paramount in interpreting and implementing the statutory scheme" governing when and how to free a child from parental custody and control. (*Neumann v. Melgar* (2004) 121 Cal.App.4th 152, 162.) Thus, the best interests of the child is always an overarching concern where, as here, a petitioner has presented clear and convincing evidence satisfying one of the statutes. (See, *In re Baby Boy S.* (1987) 194 Cal.App.3d 925, 933 ["Absent intent on the part of the parents to abandon the child, as the court found here, the best interests and welfare criteria are simply not applicable."].)

Eric believed it would be in M.B.'s best interest to have contact with him. Although he admits that M.B. suffered trauma from the incident, he claims that being "torn" from him has also caused M.B. to suffer trauma. In granting the petition, the trial court placed "great weight" in the testimony and opinion of Dr. Carbonell, M.B.'s treating psychologist, who opined that it was not in M.B.'s best interests to reunify with Eric at this time.

20

Dr. Carbonell began treating M.B. approximately three months after the incident when M.B. was three and one-half years old. At that time, M.B. needed constant reassurance, did not sleep well, cried excessively, suffered severe temper tantrums, exhibited anxiety and fear of males, and had begun stuttering. During play therapy, M.B. stated, " 'My bad daddy hurt my mom. My bad daddy threw me. My bad daddy was taken by the police.' " M.B. also remembered fighting and "male dominant figures . . . making the female figure cry."

With the help of speech therapy, M.B. no longer stutters. Dr. Carbonell stated that M.B. has made "a lot of progress" but that M.B. "continues to be fragile" and that M.B. will need therapy "for a long period of time." Dr. Carbonell opined that M.B.'s psychological development would be "seriously impacted" if Eric were introduced at this point in her life, stating that M.B. "has not accessed one single good memory of" Eric. Although Dr. Carbonell described herself as "a champion in reunification" she stated that this was one of the few cases where she looked but could not find "the therapeutic way to reach reunification." In contrast, M.B. referred to Adam as her " 'good dad' " and expressed her love for him. After viewing interaction between M.B. and Adam, Dr. Carbonell described their relationship as "strong," "affectionate," and "securely attached."

Although the trial court made no express finding regarding M.B.'s best interests, we are satisfied the court impliedly made a finding, based on clear and convincing evidence, that terminating Eric's parental rights was in M.B.'s best interests.

## DISPOSITION

The order terminating Eric's parental rights is affirmed.


HALLER, Acting P. J.

WE CONCUR:


IRION, J.


DO, J.