33 Cal.3d 826 (1983)
662 P.2d 922
191 Cal. Rptr. 464
In re LAURA F. et al., Minors.
DEPARTMENT OF SOCIAL SERVICES, Petitioner and Respondent,
v.
DELLA H., Objector and Appellant.
Docket No. S.F. 24344.
Supreme Court of California.
May 19, 1983.
*828 COUNSEL
Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Christine Zilius, Deputy State Public Defender, for Objector and Appellant.
Robert Burns as Amicus Curiae on behalf of Objector and Appellant.
*829 George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, and Margaret A. Rodda, Deputy Attorney General, for Petitioner and Respondent.
John H. Larson, County Counsel (Los Angeles), and Sterling R. Honea, Deputy County Counsel, as Amici Curiae on behalf of Petitioner and Respondent.
OPINION
KAUS, J.
Della H. appeals from an order of the Superior Court of Yuba County dated January 8, 1980, declaring her three children, Stacy H., Laura F., and Tammy F.  born, respectively, in 1968, 1973 and 1975  free from her custody and control under Civil Code section 232, subdivision (a)(7).[1] The children were originally removed from Della's care in 1976 after a series of investigations for neglect. Following dependency proceedings (Welf. & Inst. Code, § 300, subd. (a)), Stacy was placed with his paternal aunt and uncle; his younger stepsisters were placed in separate foster homes with nonrelatives. On July 25, 1979, the state initiated two proceedings under section 232, subdivision (a)(7)[2] to terminate parental rights, one involving Stacy, the other, Laura and Tammy.
After five days of hearing, with testimony from social workers, foster parents, a psychologist, Della, and Stacy's father and uncle, the superior court entered one judgment freeing the three children from Della's control. Pursuant to section 239, the Director of the Department of Social Services was appointed *830 guardian and the children were referred to the California Adoptive Service for placement. Della's separate appeals have been consolidated.[3]
The appeal raises five issues: (1) whether "foster home" within the meaning of section 232, subdivision (a)(7) includes care in the home of a relative; (2) whether the evidence was sufficient to support the judgment; (3) whether the county offered Della adequate help to regain her children; (4) whether the court employed the proper standard of proof; and (5) whether the court erred in failing to appoint counsel for the children.

I

DEFINITION OF "FOSTER HOME"
(1) Della contends that the proceedings as to Stacy did not meet the threshold requirement under subdivision (a)(7)  that he have spent two years in "one or more foster homes." The issue is whether Stacy's placement with his aunt and uncle constitutes care in a "foster home."
Della relies on In re Antonio F. (1978) 78 Cal. App.3d 440 [144 Cal. Rptr. 466], the first case to define "foster home" as "care other than in the home of a parent or relative." In Antonio F. the court considered a termination order under subdivision (a)(7) against a mother who, fearing deportation, left her children with their aunt for five years. In her absence the children were adjudged wards of the court and placed with the aunt. The mother received no notice of the dependency proceedings and continued to support and correspond with the children. The Court of Appeal reversed on three grounds: (1) the state's efforts to notify the mother of the dependency hearings were inadequate; (2) no evidence supported the finding that she was unable to provide an adequate home for her children; and (3) the children, placed with a relative, had not been in foster care within the meaning of subdivision (a)(7).
Antonio F. spawned a definition of foster care that was both unnecessary to the decision and wrong. The Antonio F. court found what it felt was the relevant definition in a statute dealing with the administration of the aid to families with dependent children  foster care program (AFDC-FC), section 11251 of the Welfare and Institutions Code. The definition of "foster care" employed in section 11251 reflected a funding scheme in which dependent children placed with relatives received less aid than those placed with nonrelatives. Under the federal program (§ 408(a)(1)(2), Social Security Act), children placed in foster homes  AFDC-FC recipients  were allowed greater monthly payments than those available under the basic AFDC programs. *831 Although the federal statute did not exclude homes of relatives from the definition of foster homes, that is how California interpreted it. The idea behind that interpretation  that neglected children placed with relatives need fewer services  was discredited in Miller v. Youakim (1979) 440 U.S. 125 [59 L.Ed.2d 194, 99 S.Ct. 957]. Disapproving an Illinois statute similar to California's, the Supreme Court found that there was no intent in the federal statutes to preclude children placed in the homes of relatives from AFDC-FC funds: "[T]o differentiate among children who are equally neglected and abused" because of the status of their court-appointed substitute parent is "unreasonable." (Miller, supra, at p. 145 [59 L.Ed.2d at p. 209].) After Miller, the Welfare and Institutions Code was amended. Section 11400, replacing section 11251, now provides: "... (e) `Foster care' means the 24-hour out-of-home care provided to children whose own families are unable or unwilling to care for them, and who are in need of temporary or long-term substitute parenting."
Acceptance of the narrow definition of foster care articulated in Antonio F., and followed in at least one later case,[4] can have sad consequences, as this case illustrates. Stacy, who was placed with relatives, has hope of an immediate adoption. At the hearing, his uncle stated that he and his wife planned to adopt him as soon as he was eligible. An interpretation of "foster care" as set forth in Antonio F. will preclude adoption of Stacy unless he spends one more year in the foster care of nonrelatives. Such a result would surely not be consonant with the purpose of the statute, as stated in section 232.6, to "serve the welfare and best interests of a child by providing the stability and security of an adoptive home when those conditions are missing from his or her life."[5]
Insofar as Antonio F. narrowly defines foster care and relies on former Welfare and Institutions Code section 11251, it is disapproved. The trial court correctly found that the three children met the threshold requirement of two years placement in a "foster home."

II

SUFFICIENCY OF EVIDENCE
(2a) Della contends that the judgment must be reversed for insufficiency of evidence to support the findings of the trial court on the remaining provisos of *832 subdivision (a)(7): that the return of the child to the parent would be detrimental to the child and that, during the years of foster home care, the parent failed, and is likely to fail in the future, to provide an adequate home for the child or to maintain an adequate parental relationship with the child. Our review of the record convinces us that there is ample evidence to support the requisite findings as to each of the children.
On October 13, 1976, when it became apparent that Della was providing less than minimal care for the children, they were taken from her custody and placed under foster care. The children were declared wards of the juvenile court under subdivision (a) of former section 600 (now § 300) of the Welfare and Institutions Code which provides for wardship of a child whose parents are either incapable or unwilling to exercise effective parental care or control.[6] If the parents' incapacity or unwillingness to provide care or control continues for an extended period of time and there is no indication that they can or will rehabilitate themselves, they become subject to the potential termination of parental rights as provided in subdivision (a)(7) of section 232. In 1979, at the time of the termination proceedings in this case, subdivision (a)(7) provided a waiting period of two years during which time the offending parent might rehabilitate himself as a parent and regain full custody and control of the child. Albeit in dicta, we pointed out in In re Carmaleta B. (1978) 21 Cal.3d 482 [146 Cal. Rptr. 623, 579 P.2d 514], that subdivision (a)(7) differed in some respects from the other subdivisions of section 232: "The section, accordingly, balances the interest of the child in secure and sufficient parenting with the conjoined interests of both parent and child in preserving the familial bond. The subdivision has the added advantage of permitting the parents a longer period, two years, in which to rehabilitate themselves to a position whereby they can properly support this most fundamental responsibility. Such an accommodation, inherent in the structuring of section 232, affords the fullest opportunity to the parents for exercise of their rights not inconsistent with the ultimate best interests of the child." (21 Cal.3d at pp. 491-492.)
The means by which the balancing of interests of which we spoke in Carmaleta B. is achieved is, of course, foster care. Legislative recognition that foster care is at best only a temporary solution and that the ultimate best interest of the child calls for stability and permanence was restated in 1980 in section 396 (Welf. & Inst. Code) as follows: "It is the policy of the Legislature that foster care should be a temporary method of care for the children of this state, that children have a right to a normal home life, that reunification with the natural parent or parents or another alternate permanent living situation such as *833 adoption or guardianship are more suitable to a child's well-being than is foster care, and that this state has a responsibility to attempt to ensure that children are given the chance to have a happy and healthy life, and that, to the extent possible, the current practice of moving children receiving foster care services from one foster home to another until they reach the age of majority should be discontinued." At that time, the Legislature amended subdivision (a)(7) to decrease from two years to one year the time permitted the incapable or unwilling parents to rehabilitate themselves for resumption of parental responsibilities.[7]
Keeping in mind that our task is not to reweigh the evidence or to express an independent judgment thereon but merely to decide whether there is sufficient evidence to support the findings of the trial court (In re Angelia P. (1981) 28 Cal.3d 908, 924 [171 Cal. Rptr. 637, 623 P.2d 198]; In re Robert J. (1982) 129 Cal. App.3d 894, 901 [181 Cal. Rptr. 188]), we examine the record to decide whether return of the three children to Della would be detrimental to them and whether she failed in the past and is likely to fail in the future to provide an adequate home for them or to maintain an adequate parental relationship with them.
Although subdivision (a)(7) focuses on the parent's failures during the period of foster care and the likelihood of failure in the future, a measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child. (In re Angelia P., supra, 28 Cal.3d 908, 925; In re Lynna B. (1979) 92 Cal. App.3d 682, 700 [155 Cal. Rptr. 256]; In re Norma M. (1978) 77 Cal. App.3d 110, 116 [143 Cal. Rptr. 412].) Thus, Della's relationship with the children before 1976 has relevance to her continuing and future capacity as a parent and, indeed, is the only indication of the quality of her parenting at a time when she was solely responsible for them.
Background  1976. Stacy, born in 1968, was for the first few years of his life cared for primarily by his grandmother (Margaret S.). In October 1970 Della had a second child, Tina, who was later adopted by Margaret S. Child *834 Protective Services first became involved in 1971 when Margaret S. complained that she had the children and that AFDC payments to Della were being used to support the drug habit of Larry F., Della's boyfriend and future father of Laura and Tammy.[8] Laura was born in April 1973, Tammy in April 1975. The children were buffeted by the stormy relationship between Della and Larry and neglected by Della except for short periods when she and Larry were reconciled. The children were reported to the authorities as sleeping in cars and begging for food. The family moved continually  five times in one eighteen-month period  and the children were "farmed out" to whomever was handy, for days, weeks, months, or years. The dependency proceeding in 1976 followed a series of such placements: Della had given Tammy to a woman whose last name she did not know; Laura had been left with a woman herself accused of child neglect; Stacy, however, had been picked up by his paternal aunt and uncle several days earlier.
The condition of the children in 1976 when taken from Della reflected the inadequacy of their care. Stacy, then eight and of normal intelligence, functioned at the level of a child less than half his age. Laura, three and a half, born with severe physical disabilities,[9] could not talk and would not walk ("had to be carried around"). Tests indicated that the child, a girl of normal intelligence, had a three-word vocabulary. Her teeth were rotten and her belly extended. Tammy, the youngest, was then a year and a half old. She never cried, nor did she acknowledge pain; she did not want to be held or to receive affection.
Dependency period  1976-1979. After the children were placed in foster homes Della was repeatedly counseled to get a job, establish a home  she has moved 15 times in 1 year  stay out of jail, and prove to the court that she could adequately care for her children. She followed none of the advice. During the first two and a half years of the dependency, she visited the children only sporadically. Between October 1976 and May 1978, she made five of the scheduled biweekly visits with Stacy. Visits with Tammy and Laura occurred more frequently, especially during a three-month period when, pursuant to order of the court, the children were delivered to her by a social worker. On her own, Della kept less than half of scheduled visits and often failed to visit for one or two months at a time.
Della has virtually never worked. Her brief forays into the job market, as a motel maid or housekeeper, usually ended within a week or two with her quitting without notice. How she supported herself is somewhat of a puzzle. During the winter of 1977 she apparently used Laura's social security check for her *835 own needs instead of forwarding it for Laura's foster care. She and her boyfriend were jailed at least once for refusing to deliver the checks to the court, as ordered. The record is silent as to other sources of support.
Six months before the November 1979 hearing which led to the order under appeal, Della's mother rented a one-bedroom apartment in Della's name. It is unclear whether Della actually lived there. About then Della began visiting the children more frequently. Two weeks before the hearing she married an agricultural worker with whom she had been living on and off for several years.
Dr. Wuehler, a psychologist, examined the children in 1979 and testified for petitioner. He found that all three children had regained their ground intellectually and were prospering in their placements with substitute parents. Stacy was doing particularly well with his aunt and uncle, and the girls had formed strong bonds with their foster parents. He testified that all would suffer some anxiety if separated from their foster homes.
In Dr. Wuehler's opinion, it would have been detrimental to the children to return them to their mother. Although he had not examined Della, it seemed to him that on the basis of her past conduct she was incapable of attending adequately to the pressing needs of the three children. Laura had a particularly high risk of having future psychological, educational, and emotional problems; she would need a family that could deal effectively with her very special developmental needs. Stacy too had special problems because his attachment to Della, based primarily on "role reversal" (the need to protect his mother), was both misplaced and abnormal. Tammy's problems were primarily emotional; strongly and emotionally attached to her foster mother, she had only an "intellectual" attachment to her biological mother.
Dr. Wuehler concluded that despite Della's professed love for the children and their lingering attachment to her, Della's inability to provide consistent parenting would be detrimental to them. He was reluctant to address the prospects for improvement in Della's capacities as a parent in the future but, based upon her complete failure to rehabilitate herself with the assistance offered by the county in the three years before the termination proceedings, there was no probability that she would be able to meet the responsibilities of mothering the three children if they were returned to her.
Based on this evidence, the trial court found that Della was "not capable, mentally or emotionally, to provide a stable home or environment for the children. Her apparent concern in the past has been the receipt of the funds provided by the government, or her own needs, rather than the well-being of the children. On those occasions when the children have stayed with Della, they were `farmed out' with relatives or `friends'. The latter relationships were of *836 extremely short duration and in fact could, in some instances, be classified as strangers. The mother has been on the move almost constantly, and has engaged in numerous living arrangements with various men. [¶] Her present marriage to Ricardo does not enhance the aspects of stabilizing home and environment in that Ricardo, the present husband, is a migrant laborer and follows the crops. The renting of the present home is a result of Mrs. [S.'s] efforts and does not appear to be those of Della's. Having a `house' does not meet the definition of a `home.'" The court concluded that Della's past and present record indicated that she had failed and would fail in the future to provide the children with the care needed and that it would be detrimental to the children to return them to her.
We recognize the gravity of the decision to terminate parental rights and that the granting of a petition for severance under section 232 results in an irrevocable break in the bond between parent and child. (In re Angelia P., supra, 28 Cal.3d 908, 928.) The Legislature has, however, directed the courts to balance the interest of the child in secure and sufficient parenting with the interests of all parties in maintaining the family. (In re Carmaleta B., supra, 21 Cal.3d at p. 491.) Subdivision (a)(7) is obviously directed to providing for the child what may be his last opportunity to achieve the benefits and comforts of a permanent family home. Viewing this record in the light most favorable to the judgment below, there clearly is substantial evidence that termination is in the best interest of the children. (In re Marcos S. (1977) 73 Cal. App.3d 768, 781 [140 Cal. Rptr. 912].) The evidence demonstrates that Della depended, and at the time of the hearing still depended, on others to take care of her. She has shown few signs of becoming responsible for herself or the children and she has woefully failed to provide adequate care or maintain adequate relationships with the children in the past. The trial court was justified in concluding that her behavior and attitudes had not markedly changed and that she would not be an adequate parent in the future.
Della contends that this is not the extreme case of neglect or abandonment which calls for the imposition of such a drastic measure as termination of parental rights, citing In re Carmaleta B., supra, 21 Cal.3d 482, and In re T.M.R. (1974) 41 Cal. App.3d 694 [116 Cal. Rptr. 292]. Neither of those cases involved proceedings under subdivision (a)(7). In Carmaleta B. we upheld a finding of neglect (subd. (a)(2)) where the children were originally removed from the parents' custody because of physical abuse by the father and where, after three years of foster care, there was evidence that the mother still did not appreciate the necessity of keeping the children from their father and could not be relied upon to live away from him if the children were returned to her care.
In T.M.R. the termination of parental rights was based upon abandonment and neglect for a period of one year before the commencement of the action. *837 The charges were premised, however, on actions the mother had taken or failed to take during the year she spent in prison after conviction for possession of marijuana; the children had originally been made wards of the court because there was no one to care for them when the parents were arrested. In overturning the finding of neglect in T.M.R., the appellate court noted that, before she was deprived of her children, the mother had been a good and loving mother who gave excellent attention and supervision to her children. (41 Cal. App.3d at p. 700.)
Contrast the case before us. The children were originally removed from Della's custody for a compelling reason  her incapacity or unwillingness to provide even the minimal care and control to which they were entitled. The record is replete with evidence of her deficiency as a parent. It is true that Della was poor, but the hallmark of an effective parent has never been the parent's bank account. Children can be and are loved and nurtured in poverty-stricken families and deprived and neglected in affluent homes. In our view, this record simply demonstrates an extreme case of deficient parenting.
There was no conflict in the experts' evidence that Della cannot now provide them a home and that return of the children to her now would be detrimental. No expert was willing to predict the future in a positive way but the consensus was that it was unlikely, based on her past record, that she would ever be able to provide the kind of parenting to which the children are entitled. As the court summed it up: "What of the future? Are the detriments of the present likely to be overcome or will they continue in the future? [¶] Sadly, the answer is an unqualified `No'; Della's present conduct and past record indicate that it is extremely remote that she will ever be able to offer a satisfactory environment, home, emotional stability, or maternal maturity to these children."
It may be suggested that nothing be done, that the children be permitted to stay where they are. (3) As noted several times, however, the purpose of the statute permitting termination of parental rights is to "serve the welfare and best interests of a child by providing the stability and security of an adoptive home...." (§ 232.6; In re D.L.C. (1976) 54 Cal. App.3d 840 [126 Cal. Rptr. 863].)[10] To facilitate the stated goal, "it seems indisputable that ... the state as a parens patriae not only has a compelling interest but also a duty to sever the parental bonds once a situation contemplated by the statute arises." (In re Eugene W. (1972) 29 Cal. App.3d 623, 629 [105 Cal. Rptr. 736]; In re D.L.C., supra, 54 Cal. App.3d at p. 850.)
*838 There is, of course, no specific proof that Laura and Tammy will be adopted or, indeed, that the now prospective adoption of Stacy will be effectuated. Neither, however, is there authority for the proposition that termination is improper unless there is an adopting parent waiting in the wings. The statute itself imposes no duty on the superior court to make an express finding as to the prospects for adoption of a particular child.[11] Suffice it to say that the trial court here referred all three children to the California Adoptive Service for placement, impliedly finding that they were all appropriate candidates for its services.
We take no issue with the proposition that the purpose of section 232 is to facilitate the adoption of minor children. We also recognize that some children are more "adoptable" than others and that a child's chances of obtaining the security of an adoptive home are lessened by emotional or physical handicaps. But for a child who faces, in all probability, perpetual foster care with no realistic chance for a stable home with natural parents, it can only be a plus to become legally eligible for adoption.[12] We are satisfied that the possibility of adoption for all of Della's children is at least as good or better than the possibility  described by the court as "extremely remote"  that Della will ever be capable of exercising parental responsibilities. Thus the termination of parental rights under these circumstances is "the least detrimental alternative" for the three children whose only other realistic alternative is the limbo of perpetual foster care.
(2b) In sum: the evidence amply supports the findings of the trial court and its disposition is entirely in accord with the legislative purpose of section 232.

III

MISCELLANEOUS CONTENTIONS

A.

Adequacy of Services Offered to Della
(4) Della contends that the state's efforts to help her regain custody of the children were inadequate. The contention is without merit. It is true that where, *839 as here, the state initiates the termination proceedings, the trial court must consider, inter alia, whether appropriate social services were previously offered to help the parent regain custody. (See, e.g., In re Lynna B., supra, 92 Cal. App.3d at pp. 701-702.) In its notice of intended ruling, however, the trial court concluded that the state, through the Child Protective Services, had done "all that is reasonably possible to do in order to help the mother accomplish the return of her children." The record supports the court's conclusion. From 1976 to 1979, Della was counseled by various social workers and advised of the changes she had to make in order to regain custody of her children. Her failure to win back the children indicates her lack of interest or capacity rather than the inadequacy of the services offered.

B.

Standard of Proof
(5) Subdivision (a)(7) requires that the trial court make its findings on clear and convincing evidence, and the trial court expressly did so. Della's position is that the proper standard of proof in a proceeding to irrevocably sever all parental ties is proof beyond a reasonable doubt. Trial counsel recognized, however, that the issue was then before us in In re Angelia P., supra, and conceded that resolution of that case would control the issue in the instant case.
In February 1981  a little over a year after the hearing in this case  we filed Angelia P., rejecting the contention that in section 232 proceedings due process requires proof beyond a reasonable doubt and holding that findings under any subdivision of the section must be made on the basis of clear and convincing evidence. The United States Supreme Court later reached the same conclusion in Santosky v. Kramer (1982) 455 U.S. 745, 769-770 [71 L.Ed.2d 599, 617, 102 S.Ct. 1388, 1402-1403].

C.

Independent Counsel for Children
(6) Della's final assignment of error is the failure to appoint independent counsel for the three children. Section 237.5 provided that in proceedings under section 232 the trial court "may appoint counsel to represent the minor." (Italics added.) In its notice of intended ruling, the trial court stated: "Finally, the court did consider the necessity of appointment of independent counsel for the children. The court's familiarity with the juvenile court proceedings involving the children, the nature of the case, prior conversations with the children (and chamber sessions with the children during the trial) and a conclusion by this court that the children's best interests could be protected by the court, as *840 well as the respective positions of both counsel, all led to the conclusion that independent counsel was not necessary to protect the interests of Stacy, in particular, who is 11 years old, and those interests of the two little girls, Tammy and Laura."[13]
It is a function of an appellate court to see if a minor's interests were adequately represented (In re Christina L. (1981) 118 Cal. App.3d 737, 747 [173 Cal. Rptr. 722]). "[W]hen the court finds a child has separate interests not protected in the contest between parents and a petitioner, the court must exercise its discretion by appointing separate counsel." (In re Richard E. (1978) 21 Cal.3d 349, 354 [146 Cal. Rptr. 604, 579 P.2d 495].) But where "the proceedings are instituted by a public agency on behalf of a child that has been a dependent of the juvenile court for a number of years, counsel for the public agency can adequately represent the child's interests." (In re Christina L., supra, 118 Cal. App.3d at p. 747, citing In re Heidi T. (1978) 87 Cal. App.3d 864, 876 [151 Cal. Rptr. 263].) Here the proceedings were instituted by a public agency on behalf of three children who had been dependents of the court for a number of years. There is no hint that petitioner's counsel overlooked the interests of these minors. We therefore conclude that the trial court did not abuse its discretion in its decision not to appoint independent counsel for the children.
The order appealed from is affirmed.
Mosk, J., Richardson, J., and Hanson (P.D.), J.,[*] concurred.
BIRD, C.J., Concurring and Dissenting.
I dissent from section II of the majority opinion for I am particularly disturbed by the holding that the mother-daughter relationship must be terminated. As a result of this decision Laura and Tammy will permanently lose the right to see their natural mother even though there is evidence that their relationship has been a close and loving one. This relationship should not be permanently severed without some showing of adoptability.
Even a cursory glance through the statutory scheme (Civ. Code, § 232 et seq.) reveals a clear legislative intent that parental rights are not to be terminated unless there is at least some realistic possibility that the child or children will be adopted thereafter. In the present case, no evidence was presented to the trial court suggesting that either Laura or Tammy was adoptable. Indeed, the scant testimony relevant to the issue indicated they were not.
*841 There was, however, undisputed evidence of a long, caring, and nonabusive  albeit deficient  relationship between the girls and their natural mother, Della. Thus, when the superior court terminated the fundamental mother-daughter relationship, there was neither a reasonable prospect of replacing so basic a bond with anything comparable nor any evidence that continuing the relationship would be detrimental to the girls.
The majority's response to this is to ignore virtually all of the relevant statutes. Incredibly, they apparently believe there is no authority for the proposition that termination of parental rights should not occur in the absence of evidence of adoptability. (Maj. opn., ante, at p. 838.)
In this manner, the majority relegates these girls to continuing the status quo  foster home placement  except that the state has now excluded from their lives the natural mother whom they love and who loves them. This result not only undermines the black-letter intent of the Legislature, but is illogical as well.

I.
The facts recited in the majority opinion regarding Laura, Tammy, and their mother Della tell less than the full story. Della met Larry F. in early 1970. Thereafter a relationship began which lasted for about six years. In 1973, the couple had their first child (Laura) and, in 1975, their second (Tammy).
Della and Larry's relationship was not a happy one. The couple separated a number of times. Larry frequently drank to excess, used drugs, and on at least two occasions stole his disabled daughter's Social Security check to support his habits. Although there is no evidence in the record that Larry physically abused Laura or Tammy, he was violent toward Della. During the years from 1974 through 1976, Larry was convicted six times for driving under the influence of alcohol.
The family had several contacts with the county welfare department. Although Della had no marketable job skills, had barely reached the 10th grade in school, possessed only a "very basic" ability to read and write, and appeared to be "somewhat clumsy" in performing mundane tasks of feeding, the department offered her no education, counselling, or training. Instead, they focused on Larry. As one social worker testified, "The department policy at that time was to focus on the man if he was an employable person in the home."
In September of 1976, Larry and Della separated again. Della had no income and no suitable place to live so Laura and Tammy remained with Larry. However, Larry unexpectedly appeared one day and returned the girls to Della. *842 At the time, Della was staying with a cousin. According to her social worker, Della had "no money, no way to keep them, no place to live, and [Larry] knew this when he dropped the children off with her." Larry again took Laura's Social Security check.
Della made temporary arrangements for the girls to stay with friends. The social worker found Della to be distressed over these arrangements "but she had no alternatives."[1] The social worker brought up the possibility of foster care and a formal dependency action. (Former Welf. & Inst. Code, § 600, subd. (a), repealed by Stats. 1976, ch. 1068, § 20, p. 4782. See now Welf. & Inst. Code, § 300, subd. (a).) Della agreed.
Accordingly, a section 600 petition was filed with the juvenile court. It alleged that Della "has separated from the [minors'] father and has no home or finances with which to provide for the [minors]." The social worker noted that there was no allegation against Della of neglect, abuse, or molestation.[2]
In October of 1976, the section 600 petition was sustained, and Tammy and Laura were declared to be dependent children of the court. By early 1977, both girls had been placed in foster homes where they were living at the time the hearings were held on the petition to terminate Della's parental rights.[3]
During the first two and one-half years following the dependency hearing, there were, according to Della's social worker, "periods when [Della] moved frequently to the point she really didn't have a residence, and ... other periods when she stayed in the same place for quite some period of time." Although Della repeatedly attempted to have her children returned to her by the court, her visits with them were erratic. She had no jobs skills, but did obtain employment on three or four occasions as a maid or live-in housekeeper. None of these jobs lasted more than three months. Della did not seek job training.
Beginning in the early spring of 1979, however, Della's situation improved considerably. Her visits with Laura and Tammy became both frequent and *843 regular. With her mother's help, she rented an apartment where she lived through the termination proceedings. She worked for much of the time as a babysitter or housekeeper. In the fall, she married a man she had been seeing for several years, Ricardo B.[4]
In late July of 1979, a petition was filed in the superior court to terminate Della's parental rights pursuant to subdivision (a)(7) of Civil Code section 232.[5] Hearings on the petition were held in November. Those hearings produced considerable evidence of an abiding love between the children and their mother, Della. As the deputy attorney general conceded in her argument to the trial court, "Your Honor, I don't think there's anyone in this courtroom who doesn't believe that Della ... loves her children, and that her children love her." The trial court agreed.[6]
No evidence was introduced at the hearing to show that Della's relationship with Laura and Tammy was detrimental to the girls. There was testimony from a psychologist, who opined that returning the girls to Della's custody "would more than likely be detrimental than not [sic]." In his view, this would occur because the girls would suffer from "separation anxiety" if removed from their current foster homes and returned to the custody of their mother. He admitted, however, that separation anxiety can be expected whenever a long-term foster placement is changed. He was not asked, nor did he testify, as to whether maintaining the mother-daughter relationship would be detrimental to the girls.

*844 II.
The proceedings authorized by section 232 are one part of a comprehensive scheme by which the state asserts its strong interest in the welfare of children. As was noted in In re B.G. (1974) 11 Cal.3d 679, 696 [114 Cal. Rptr. 444, 523 P.2d 244], "California has at least eight separate proceedings in which [child] custody questions can be litigated." The primary focus of this scheme is the welfare and best interests of the child. (See, e.g., §§ 227; 232.6; 4600, subd. (b).)
The termination of parental rights contemplated by section 232 is the ultimate contingency in the overall plan. It represents the total and irrevocable severance of the bond between parent and child. (§§ 232.6, 238.) As the United States Supreme Court has recently emphasized, "Few forms of state action are both so severe and so irreversible." (Santosky v. Kramer (1982) 455 U.S. 745, 759 [71 L.Ed.2d 599, 610, 102 S.Ct. 1388].) The child's emotional relationships with his or her natural parents and siblings are cut off. Any right to parental support or to an inheritance from biological family members is extinguished. The natural parents, in turn, are "denie[d] ... physical custody, as well as the rights ever to visit, communicate with, or regain custody of the child." (Id., at p. 749 [71 L.Ed.2d at p. 603], fn. omitted.)
These are fundamental liberty interests which are at stake. (Id., at p. 753 and fn. 7 [71 L.Ed.2d at p. 606].) They are "ranked among the most basic of civil rights...." (In re B.G., supra, 11 Cal.3d at p. 688.) Moreover, the "fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." (Santosky v. Kramer, supra, 455 U.S. at p. 753 [71 L.Ed.2d at p. 606].)
Consequently, the parent-child relationship may be terminated under section 232 "`only in extreme cases of persons acting in a fashion incompatible with parenthood.'" (In re Angelia P. (1981) 28 Cal.3d 908, 916 [171 Cal. Rptr. 637, 623 P.2d 198], quoting In re Carmaleta B. (1978) 21 Cal.3d 482, 489 [146 Cal. Rptr. 623, 579 P.2d 514].) Termination may not occur in the absence of a compelling state interest,[7] and substantial evidence must support a finding that "severing the parental relationship [is] the least detrimental alternative for the children."[8]
*845 Other provisions of statutory law permit a child to be taken from the custody of a deficient parent without extinguishing the parent-child relationship or terminating all parental rights. (See especially Welf. & Inst. Code, § 300 et seq.) Thus, resort to termination proceedings is both unnecessary and inappropriate unless, inter alia, the state intends  and is reasonably likely  to provide the child with a satisfactory long-term replacement for the otherwise permanent parental relationship that is being terminated. In short, a termination of the fundamental parent-child relationship is normally appropriate only when adoption is realistically contemplated.[9]
Case law, legislative history, and black letter statutory language all confirm this obvious conclusion. The courts of this state have long recognized that the "purpose of [a section 232 action] is to facilitate adoption of the minor child." (In re Marriage of O'Connell (1978) 80 Cal. App.3d 849, 854 [146 Cal. Rptr. 26].[10] Indeed, the statutory provisions regarding the termination of parental rights were originally transferred from the Juvenile Court Law to the Civil Code for precisely this reason: "What is contemplated by court action under [the statutory predecessor to section 232] is not continuing guidance and supervision by a governmental agency, but freeing the child for adoption by a private person. This is essentially an adoption problem and, therefore, should be handled by the civil court handling adoptions." (Governor's Special Study Com. on Juvenile Justice (1960) pt. I, p. 23. See also In re Jacqueline H. (1978) 21 Cal.3d 170, 174, fn. 1 [145 Cal. Rptr. 548, 577 P.2d 683].)
The language of the statutes themselves makes this point with unmistakable clarity. Thus, section 232.6 specifically states that the "purpose of this chapter" in providing for the termination of parental rights is "to serve the welfare and best interests of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from his or her life." (Italics added.)[11]
*846 The essential role of adoptability was recently underscored by the enactment of Welfare and Institutions Code section 366.25. (Sen. Bill No. 14, ante, fn. 5, Stats. 1982, ch. 978, § 27.) This section deals with the disposition by the juvenile court of children  like Laura, Tammy, and virtually all children on whose behalf proceedings are brought under subdivision (a)(7)  who have been determined to be dependent children of the court (Welf. & Inst. Code, § 300).
The pertinent provisions of the new law apply when a dependent child cannot be returned home and there is no "substantial probability" of such a return within six months. (Welf. & Inst. Code, § 366.25 [hereafter, § 366.25], subd. (d).) Under these circumstances, the juvenile court shall order the initiation of section 232 proceedings if "the minor is adoptable." (§ 366.25, subd. (d)(1).) If, however, "the court finds that the minor is not adoptable," it orders the initiation of legal guardianship proceedings. (Id., subd. (d)(2).) Or, if there is no suitable adult available to become legal guardian, then some other plan is worked out for placement "in a home environment that can reasonably be expected to be stable and permanent." (Id., subd. (d)(3).)
Thus, a section 300 finding only entitles the juvenile court to order section 232 proceedings if the minor is adoptable. Even as to adoptable dependent children, however, the Legislature has specified three situations in which termination proceedings are inappropriate.[12] In addition, the statutory scheme indicates that termination of parental rights is not appropriate if the outlook for the dependent child is for something other than adoption, i.e., legal guardianship or long-term foster care. Thus, adoptability has once again been revealed to be of critical concern to the Legislature in the area of termination of parental rights.
No evidence was presented to the superior court in the present case suggesting that Laura or Tammy was adoptable. Rather, the limited testimony touching upon this issue indicated they were not.[13] Thus, the superior court's *847 order terminating Della's parental rights placed the girls in the position of having neither a parent nor the realistic prospect of ever gaining one.
Moreover, there was no evidence that allowing the mother-daughter relationship to continue would be detrimental to either of the girls. Quite the contrary, both girls had had a long and loving  if deficient  relationship with their natural mother. "[T]he importance to a child of continuity of parental relationships" cannot be underestimated. (See Adoption of Michelle T., supra, 44 Cal. App.3d at p. 706.) No purpose is served by permanently severing parental rights under these circumstances. Where, as in the present case, the natural parent has not abused the child, an inadequate parent is clearly preferable to no parent at all and is more consistent with the legislative scheme.[14]
It is, of course, correct that the primary purpose of the overall statutory plan regarding children is to promote the best interests and welfare of the child. But the role of termination proceedings within the larger context has been plainly stated by the Legislature. It is not to remove the child from the custody of deficient parents, nor is it to punish parents for their inadequacies. Rather, the explicit "purpose" of termination proceedings is to serve the child's interests "by providing the stability and security of an adoptive home...." (§ 232.6.) If "the stability and security of an adoptive home" are not reasonably likely to be achieved, and if no harm to the child flows from maintaining the existing parent-child relationship, then no purpose is served by permanently severing that basic relationship.
Nevertheless, a majority of this court apparently believe there is no authority for the proposition that termination of parental rights should not occur in the absence of evidence of adoptability. (Maj. opn., ante, at p. 838.) That belief is curious for it can be maintained only by ignoring the legislative history and virtually all of the relevant statutes. Unmentioned in the majority opinion are (1) the fact that proceedings to terminate parental rights were transferred from the juvenile court to "the civil court handling adoptions" because the matter "is essentially an adoption problem;"[15] (2) the Legislature's declaration upon enacting section 232.9 that its aim was to enable children in foster homes to "be placed in adoptive homes;"[16] and (3) the fact that the juvenile court may order the initiation of termination proceedings only if it determines that "the minor is adoptable."[17] The majority opinion does mention  but then ignores  section *848 232.6, which declares the purpose of termination proceedings to be to provide minors with "the stability and security of an adoptive home."
One result of today's decision is that, without even a whisper of justification, this court has effectively purged from the law of this state a valid, clearly expressed, logical, and consistent theme of the Legislature. On perhaps a more mundane level, two young girls have been cut off from their natural mother by the state, which has offered them no prospect of replacing what was lost. From any viewpoint, today's decision is harsh in the extreme, and I cannot subscribe to it.

III.
Two other aspects of this case trouble me profoundly. Both relate to a warning sounded recently by the United States Supreme Court in Santosky v. Kramer, supra, 455 U.S. 745. That court observed that termination proceedings similar to those authorized by subdivision (a)(7) of section 232 "employ imprecise substantive standards that leave determinations unusually open to the subjective values of the judge." (Id., at p. 762 [71 L.Ed.2d at p. 612].) Noting that "the [trial] court possesses unusual discretion to underweigh probative facts that might favor the parent," the high court observed that "[b]ecause parents subject to termination proceedings are often poor, uneducated, or members of minority groups, such proceedings are often vulnerable to judgments based on cultural or class bias." (Id., at pp. 762-763 [71 L.Ed.2d at pp. 612-613], citation and fn. omitted.)
Support for these observations can, unfortunately, be found in the present case. Initially, while it is settled that an order to free a child from parental custody and control "must rest on present circumstances as well as past acts ...,"[18] the trial court discounted Della's current situation and singled out her marriage to Ricardo B. It reasoned that because the husband "is a migrant laborer and follows the crops," the marriage "does not enhance the aspects of stabilizing home and environment." (Maj. opn., ante, at p. 836.) This reasoning is questionable. Certainly, there is nothing in the record to justify the conclusion which the trial court drew from Ricardo's employment. Rather, the court's statement seems to represent an erroneous "judgment[] based on cultural or class bias"[19] about a worthy class of people, who in fact are perfectly capable of raising healthy children with much to contribute to the lives of us all.
A second echo to the Supreme Court's warnings can be found in that portion of today's majority opinion which discusses the dependency proceedings at *849 which Della lost custody of Tammy and Laura in the first place. (See conc. and dis. opn., ante, at p. 842.) It is the majority's claim that those proceedings demonstrate an "incapacity or unwillingness" to be an effective parent and thus support the view that Della's was "an extreme case of deficient parenting." (Maj. opn., ante, at p. 837.)
In fact, however, the dependency proceedings were based on allegations that Della "has separated from the [minors'] father and has no home or finances with which to provide for the [minors]." The social worker who drew up the dependency petition specifically testified at the termination proceedings now under review that there was no allegation against Della of neglect, abuse, or molestation. In short, the dependency petition was sustained because Della was poor, recently separated, and had no place to live.
I do not criticize the local authorities for their response to what was thought to be a temporary, emergency situation. However, I question the majority's belief that these circumstances alone demonstrate an "incapacity or unwillingness" to be an effective parent. And if this alleged "incapacity or unwillingness" is in turn deemed to be evidence of "an extreme case of deficient parenting" so as to justify termination of all parental rights under subdivision (a)(7),[20] then it will indeed be the poor, the uneducated, and the minorities who are disproportionately subjected to proceedings to deprive them of their children.
I respectfully but vigorously dissent.
Broussard, J., and Reynoso, J., concurred.
NOTES
[1] At that time section 232, subdivision (a) provided, in pertinent part: "An action may be brought for the purpose of having any person under the age of 18 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions: ... [¶] (7) Who has been cared for in one or more foster homes, residential facilities licensed pursuant to Chapter 3 (commencing with Section 1500) of Division 2 of the Health and Safety Code, or health facilities licensed pursuant to Chapter 2 (commencing with Section 1250) of Division 2 of the Health and Safety Code, under the supervision of the juvenile court, the county welfare department or other public or private licensed child-placing agency for two or more consecutive years, providing that the court finds by clear and convincing evidence that return of the child to his parent or parents would be detrimental to the child and that the parent or parents have failed during such period, and are likely to fail in the future, to do the following: [¶] (i) Provide a home for the child; [¶] (ii) Provide care and control for the child; and [¶] (iii) Maintain an adequate parental relationship with the child. [¶] Physical custody of the child by the parent or parents for insubstantial periods of time during the required two-year period will not serve to interrupt the running of such period."

The statute has been amended and, effective September 13, 1982, allows termination of parental rights after 12 months in a foster home. The new subdivision also adds a requirement that the court determine that reasonable services have been offered to aid the parents to overcome their problems.
[2] Unless otherwise indicated, all further statutory references are to the Civil Code.
[3] The fathers of the children did not contest the actions.
[4] In re Sarah H. (1980) 106 Cal. App.3d 326, 329, footnote 3 [165 Cal. Rptr. 61], approves Antonio F. in dictum. Contrast the more expansive definition of a foster parent as "one who, although not legally related to the child by direct parental blood ties, nor decreed a parent in formal adoption proceedings, assumes the role of parent" in In re Lynna B. (1979) 92 Cal. App.3d 682, 696 [155 Cal. Rptr. 256] (quoting from Katz, Legal Aspects of Foster Care (1971) 5 Fam.L.Q. 283, 285). (Italics added.)
[5] Although not enacted until 1980, after the proceedings in the instant case, section 232.6 clearly expresses the underlying intent of the Legislature to protect primarily the children and to provide them with at least the possibility of a stable and secure permanent home. The Legislature has also directed that the statute providing for termination of parental rights "shall be liberally construed to serve and protect the interests and welfare of the child." (§ 232.5.)
[6] The subdivision covers a child "(a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising such care or control, or has no parent or guardian actually exercising such care or control."
[7] The 1980 legislation also added to the subdivision a requirement that the trial court determine that reasonable services have been offered to the parents and that, despite availability of services, return to the parents would be detrimental.

The same legislation amended various sections of the Welfare and Institutions Code that relate to proceedings for removal of children from the physical custody of parents. (§ 300 et seq.) Essentially the changes seek to limit the time a child remains in foster care facilities. Thus, the statute provides for periodic (six months) review and, after a year, for a "permanency planning hearing" (§ 366.25) to determine, inter alia, the appropriateness of the current placement and to project a likely date by which the child may be returned to its parents or placed for adoption or legal guardianship.
The 1980 legislation is not applicable to this case  the dependency hearings were held in 1976 and, in addition, pending section 232 cases are expressly excluded from the provisions of the new legislation.
[8] A fraud action was contemplated but not brought because the statute of limitations had run.
[9] Laura was born dwarfed, with a cleft palate and fluid in her ears. At the time of the termination hearing, she was under the care of six doctors.
[10] It is axiomatic, of course, that the longer children remain in foster homes, the more difficult it is to find families willing to adopt them. (See Mnookin, Foster Care  In Whose Best Interest? (1973) 43 Harv.Ed.Rev. 599.)

The Legislature has recently restated its policy that foster care is only a temporary method of child care and that "the current practice of moving children receiving foster care services from one foster home to another until they reach the age of majority should be discontinued." (Welf. & Inst. Code, § 396.)
[11] Contrast, for example, section 227b permitting the court to set aside a decree of adoption upon proof of developmental or mental illness such as to render a child "unadoptable."
[12] The decrease in number of newborn babies and young infants available for adoption in the past decade has resulted in efforts to reorient adoption agencies and the public toward adoption of older children, medically handicapped children, and children of all ethnic and racial backgrounds. (See Bodenheimer, New Trends and Requirements in Adoption Law and Proposals for Legislative Change (1975) 49 So.Cal.L.Rev. 10.) The number of agencies or associations committed to specialized programs for adoption of "hard-to-place" children is undoubtedly some measure of the success of the effort. (A compilation is contained in Unger et al., Chaos, Madness, and Unpredictability ... Placing the Child with Ears like Uncle Harry's (1977) Append. D.)
[13] The trial court apparently considered the question of independent counsel sua sponte; no request for independent counsel is contained in the record.
[*] Assigned by the Chairperson of the Judicial Council.
[1] As the majority opinion notes, the family with whom Della left Tammy had previously been referred to the authorities for child neglect. However, neither Della nor her social worker was aware of that fact at the time Tammy lived there, and that family's case was no longer "active." There is no indication that Tammy was harmed or neglected in any way.
[2] Simply put, the dependency petition was sustained because Della was poor and recently separated. The majority opinion calls this a "compelling reason" for removing the girls from their mother's custody, demonstrating "incapacity or unwillingness" to be an effective parent. (Maj. opn., ante, at p. 837.)
[3] Prior to arriving at these foster homes, Laura and Tammy had been tried in two other foster care placements which did not work out. When they arived at what became their long-term foster homes, both girls were far behind in their development. Laura had an extended belly, which was the result of improper nutrition. This was discovered by a doctor. The foster mother testified she herself had not noticed it.
[4] Della's change in status was noted by the foster parents of Laura and Tammy, as well as by court officers. Interestingly, Della's mother, who had called the welfare department on several occasions prior to the 1976 dependency hearings to report inadequate child care by Della and Larry, now supported Della in her attempt to keep her children.
[5] All statutory references hereafter are to the Civil Code unless expressly provided otherwise.

At the time of the court proceedings in the present case, section 232 provided in pertinent part:
"(a) An action may be brought for the purpose of having any person under the age of 18 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions:
".......................
"(7) Who has been cared for in one or more foster homes under the supervision of the juvenile court ... for two or more consecutive years, providing that the court finds by clear and convincing evidence that return of the child to his parent or parents would be detrimental to the child and that the parent or parents have failed during such period, and are likely to fail in the future, to do the following:
"(i) Provide a home for the child;
"(ii) Provide care and control for the child; and
"(iii) Maintain an adequate parental relationship with the child.
"Physical custody of the child by the parent or parents for insubstantial periods of time during the required two-year period will not serve to interrupt the running of such period."
Recently, the Legislature reduced the two-year foster care period to one year and added new paragraphs at the end of subdivision (a)(7). (Sen. Bill No. 14 (1981-1982 Reg. Sess.) Stats. 1982, ch. 978, § 1, approved by Gov., Sept. 12, 1982, filed with Sect. of State, Sept. 13, 1982, eff. immediately as urgency measure.) Other minor or irrelevant modifications to these provisions of section 232 have been made as well. (See ibid.; Stats. 1979, ch. 245, § 1, p. 534.)
[6] "All the children expressed love for their natural mother and the evidence shows that Della loves her children."
[7] In re David B. (1979) 91 Cal. App.3d 184, 192 [154 Cal. Rptr. 63].
[8] In re Carmaleta B., supra, 21 Cal.3d at page 489. Accord, In re Angelia P., supra, 28 Cal.3d at page 923; In re David B., supra, 91 Cal. App.3d at page 198. See Adoption of Michelle T. (1975) 44 Cal. App.3d 699, 707-709 [117 Cal. Rptr. 856, 84 A.L.R.3d 654].
[9] The Legislature has made abundantly clear that foster care is not a satisfactory long-term solution. "It is the policy of the Legislature that foster care should be a temporary method of care for the children of this state, that children have a right to a normal home life, that reunification with the natural parent or parents or another alternate permanent living situation such as adoption or guardianship are more suitable to a child's well-being than is foster care, and that this state has a responsibility to attempt to ensure that children are given the chance to have a happy and healthy life, and that, to the extent possible, the current practice of moving children receiving foster care services from one foster home to another until they reach the age of majority should be discontinued." (Welf. & Inst. Code, § 396.)
[10] See also, e.g., In re David B., supra, 91 Cal. App.3d at page 196; In re Shannon W. (1977) 69 Cal. App.3d 956, 962 [138 Cal. Rptr. 432]; In re Eugene W. (1972) 29 Cal. App.3d 623, 629 [105 Cal. Rptr. 736].
[11] "The Legislature [also] stated the purpose behind section 232 proceedings when it added section 232.9 to the Civil Code. `It is the intention of the Legislature in enacting this act to extend adoption services for the benefit of children residing in foster homes at public expense by facilitating legal actions required for adoption so that these children may be placed in adoptive homes where they will have the benefits of stability and security.'" (In re David B., supra, 91 Cal. App.3d at p. 195, quoting Stats. 1970, ch. 583, § 1, p. 1160.)
[12] One such situation occurs when the "parents or guardians have maintained regular visitation and contact with the minor and the minor would benefit from continuing this relationship." (§ 366.25, subd. (d)(1)(A).) Further, section 232 proceedings are not authorized when the "minor 12 years of age or older objects to termination of parental rights." (Id., subd. (d)(1)(B).) And finally section 232 proceedings are not authorized if "exceptional circumstances" prevent the minor's foster parents from adopting the minor and the removal of the minor from the home of the foster parents would be "seriously detrimental" to the minor. (Id., subd. (d)(1)(C).)
[13] The psychologist testifying on behalf of the Department of Social Services stated that Tammy would need "super parents" and that there are "not too many super parents around." As to Laura, who is physically handicapped, he testified there would be a problem locating a family "able to deal effectively with those very specific and difficult special needs, developmentally."

This testimony totally undermines the majority's claim that the trial judge made an "implied [] finding" of adoptability. (Maj. opn., ante, at p. 838.) Not only did the trial court fail to consider the point, but there was absolutely no evidence upon which an "implied finding" of adoptability could have been based.
[14] It is not the purpose of termination proceedings or of our child custody laws in general to punish parents for their shortcomings. (See, e.g., In re Paula P. (1981) 123 Cal. App.3d 734, 744 [176 Cal. Rptr. 708]; In re Marriage of Stoker (1977) 65 Cal. App.3d 878, 881-882 [135 Cal. Rptr. 616]; Ashwell v. Ashwell (1955) 135 Cal. App.2d 211, 217 [286 P.2d 983].)
[15] See ante, at page 845.
[16] See ante, at page 845, footnote 11.
[17] See ante, at page 846.
[18] In re Carmaleta B., supra, 21 Cal.3d at page 493.
[19] Santosky v. Kramer, supra, 455 U.S. at page 763 [71 L.Ed.2d at p. 613].
[20] See ante, at page 837.

I would note that amicus curiae advises us that subdivision (a)(7) is the provision most frequently employed to "free children from their [natural] parents."