[No. B009644. Second Dist., Div. Two. Apr. 17, 1986.]

In re RICO W. et al., Minors.
LOS ANGELES COUNTY DEPARTMENT OF ADOPTIONS,
Petitioner and Respondent, v.
SRI D., Objector and Appellant.

**COUNSEL**

Amy Ardell, under appointment by the Court of Appeal, for Objector and Appellant.

De Witt W. Clinton, County Counsel, and Sterling Honea, Sr., Deputy County Counsel, for Petitioner and Respondent.

**OPINION**

**GATES, J.**—Sri D. appeals from the judgment declaring her four children, Rico, Ferna, Rebecca and Robin, free from her custody and control pursuant to Civil Code section 232, subdivisions (a)(2) and (a)(7). She contends: "1. The trial court failed to make necessary, specific findings. 2. The evidence was insufficient to support the trial court's findings that appellant neglected or cruelly treated the children in the past

and continued to do so. counsel for the children. effective assistance.''

3. The court did not provide independent

4. Appellant's trial counsel did not provide effective assistance.''

Viewed in the light most favorable to the judgment as required by the usual rule governing appellate review (*In re Angelia P.* (1981) 28 Cal.3d 908, 924 [171 Cal.Rptr. 637, 623 P.2d 198]), the evidence[1] establishes that on August 14, 1979, Rico and Ferna were adjudged to be dependent children of the juvenile court. Just two weeks after the court terminated its jurisdiction on October 10, 1979, Rebecca was declared to be a dependent child as a result of her having been hospitalized from "malnourishment and/or failure to thrive."

While that order was still in effect all four children were removed from appellant's home and placed in foster care in June 1981 and on March 16, 1982, were declared dependent children under Welfare and Institutions Code section 300, subdivisions (a) and (d). Rico and Ferna, the offspring of appellant's marriage to Fred W., were placed with Karen C. where they still resided at the time of trial. Rebecca and Robin, the offspring of appellant's marriage to Warren D.,[2] were placed with Mary K. in the spring of 1982 and remained continuously under her care.

After the children were removed from their custody, appellant and Warren began attending counseling sessions, but the reports received by the department of public social services (DPSS) up to the time children's services worker Sherry Martin took over the case in November 1981 "were not favorable . . . .'' Since DPSS had previously determined that reunification would not be possible without therapy and parent effectiveness training, Martin made a number of additional referrals and worked with appellant and Warren in structuring the foster home visits. Among those with whom appellant consulted, commencing in July 1982, was clinical psychologist Richard Skultin. To the degree appellant made some improvement in her emotional stability as a result of her sessions with him, it was not the type of progress required for her to be able to protect the children. For example, appellant and Warren continued to engage in sexual activities in front of the children and showed a lack of understanding "as to what was appropriate as far as sexual activities in front of and with children." In addition, appellant and Warren pitted the children against one another and denied love if the children did not do exactly as they wanted. They brought gifts for

---

[1]On our own motion we augmented the record with the superior court file and the exhibits introduced at trial. (Cal. Rules of Court, rule 12(a).)

[2]The present judgment was also entered against Warren D., appellant's current husband, but he has not appealed.

Rebecca, but nothing for Robin. Appellant tended to physically abuse Robin "in little ways" during their monitored visits together.

In October 1982, the juvenile court informed appellant and Warren "they would have three more months in which to show that they could make progress in therapy. That at the end of that three-month period a decision would be made as to the referral to adoptions. [¶] The very next visit that they had with the minor, Rico, the father molested him in the foster home. The next visit they had with the minors, Rebecca and Robin, he molested Rebecca."

The night Rebecca was molested, she "woke [her foster parents] up screaming" and said "she was afraid that Warren was going to get in her bed." She told her foster mother she "always slept in [Warren's] bed" and added, "he would play with [her] pee pee in the dark." Although there has been no suggestion that appellant was an active participant in these incidents, Rebecca said "her mother was watching and did nothing" when she had been molested at her parents' home.[3] Moreover, appellant was present when the children were molested in their foster homes.

Following allegations by both foster parents that Warren had molested the children during monitored parental visitations on October 22 and 29, 1982, DPSS concluded family reunification was not feasible and recommended that all parental visitation cease and that the matter be referred to the department of adoptions. On November 5, 1982, the court issued its order terminating appellant and Warren's visitation rights and on February 4, 1983, referred the matter to the department of adoptions for "adoptive planning."

On March 7, 1983, Warren was convicted of three counts of lewd conduct with a child under 14 while occupying a special position of trust (Pen. Code, §§ 288a, subd. (a), and 1203.066, subd. (a)(9)), and one count of oral copulation with a person under 14 years of age and more than 10 years younger than he (Pen. Code, § 288a, subd. (c)). On May 20, 1983, the trial court denied probation and sentenced Warren to eight years in state prison but he remained free on bail pending the outcome of his appeal.[4]

On September 22, 1983, the department of adoptions filed its petition seeking to have appellant's children declared free from the custody and

---

[3] Appellant herself had previously reported Warren's sexual abuse of the children to DPSS personnel, though she subsequently denied having done so.

[4] On January 25, 1985, Division 5 of this court affirmed his conviction in *People* v. *Warren D[.]*, 2d Crim. 44743.

control of their parents. When proceedings commenced on that petition on March 15, 1984, nine-year-old Rico, eight-year-old Ferna and five-year-old Rebecca testified in chambers that they preferred to live with their respective foster parents rather than with appellant, who had been "mean" to them.[5] Three-year-old Robin did not testify.

Additional evidence revealed that each of the children had progressed spiritually, socially and emotionally after their placement in foster homes, although the changes in Robin were less dramatic than with the older ones. Rebecca became "more relaxed . . . more expressive" and ceased having frequent nightmares. Ferna came "to see herself more as a person rather than an object . . . ." Rico became more sure of himself and less fearful of things around him. His behavior problems diminished and his performance at school improved. A strong bond had developed between appellant's children and their foster parents and the children consistently expressed their desire not to return to appellant. Both foster families were desirous of adopting their respective foster children and their applications to that end had been approved in the event the children were made available for adoption.

Martin reiterated her position, based upon her contacts with the children, appellant and Warren, and her conversations with the various therapists who had seen appellant and Warren, that therapy had not proven successful in altering appellant and Warren's behavior, that reunification could not succeed and that the children should be referred for adoption. Appellant's own therapist, Skultin, testified to the difficulty in evaluating "what was potentially possible in reuniting this family" because "there seemed to be a considerable, considerable need to protect the children from possible future abuse and molestation." He also expressed the opinion that appellant had done great bodily harm to the children and that the possibility for such behavior still existed after her treatment. Although Skultin believed it was *possible* many of appellant's problems could be rectified with continued therapy, he indicated *"it would be a long road."* (Italics added.)

Appellant testified her parents had disciplined her in Indonesia by tying her to a tree and allowing her brothers to throw stones at her. She indicated that through parenting classes she had learned such methods of discipline are improper and acquired more appropriate parenting skills.

---

[5] The probation report prepared in conjunction with these proceedings revealed that while the children were in her care, appellant had beaten, "punch[ed]" and bitten them, locked them in the closet and had placed Rico's hand over an open flame. Moreover, the therapist of appellant's three oldest children testified that in her professional opinion, based upon her education and experience, they had been sexually molested as well as physically and emotionally abused.

Appellant's first contention is without merit.[6] Where the state initiates proceedings to involuntarily terminate the natural relationship of parent and child, the trial court must consider whether appropriate social services were previously offered to help the parent regain custody. (*In re Laura F.* (1983) 33 Cal.3d 826, 839 [191 Cal.Rptr. 464, 662 P.2d 922].) In its judgment, the trial court here found "[r]easonable services have been provided or offered to the parents by the Department of Public Social Services which were designed to aid the parents to overcome the problems which led to the deprivation and continued loss of custody; and despite the availability of these services, return of the children to the parents would be detrimental to the children." The record supports this determination.[7]

We know of no mandate from our highest court requiring an *express* finding that termination of parental rights is the least detrimental alternative for the welfare of the children. On the contrary, it is well-settled that in order to award custody of a child to a nonparent, without the consent of the parents, the juvenile court must "render a finding that an award to a parent would be 'detrimental to the child' and that such an award to a nonparent was 'required to serve the best interests of the child.'" (*In re B.G.* (1974) 11 Cal.3d 679, 695 [114 Cal.Rptr. 444, 523 P.2d 244]. See also *In re Angelia P., supra,* 28 Cal.3d at p. 925; *In re Carmaleta B.* (1978) 21 Cal.3d 482, 489, 495-496 [146 Cal.Rptr. 623, 579 P.2d 514]; *In re Richard E.* (1978) 21 Cal.3d 349, 356-357 [146 Cal.Rptr. 604, 579 P.2d 495].) At most, it would appear the least detrimental alternative standard is but a "more precise formulation" of the best interest of the child standard. (*In re Angelia P., supra,* at p. 929 (conc. and dis. opn. of Bird, C. J. See also *In re Angelia P., supra,* at p. 917 (majority opn.); *In re Carmaleta B., supra,* at pp. 489, 495-496.)

The juvenile court here expressly found, in accordance with its duty, that "it would be detrimental to the minors to be returned to their parents; that it is in their best interest that the petition be granted; and that an award of custody to a non-parent is required to serve the best interests and welfare of the minors." This decision clearly represents "the least detrimental alternative" for appellant's four children. At the time judgment was entered the children had been in foster homes in excess of

---

[6]Appellant's argument regarding independent counsel for her children is reiterated in her third contention; therefore, we do not discuss it here.

[7]We have read the recent decision in *In re Jose F.* *(Cal.App.), which appellant cited to us in her letter brief of April 1, 1986, and find nothing therein to cause us to alter our conclusion.

*Reporter's Note: Opinion deleted on direction of Supreme Court by order dated June 25, 1986.

three years, they wanted to remain with their foster parents,[8] who in turn desired to adopt the children. A further delay until some uncertain future date when, if all went well, the children could be returned to appellant conflicts with the intent of section 232 to afford children during their formative years a permanent, secure, and stable environment. (*In re Laura F., supra,* 33 Cal.3d at pp. 836-838; *In re Angelia P., supra,* at p. 923; *In re Lynna B.* (1979) 92 Cal.App.3d 682, 698-699 [155 Cal.Rptr. 256].)

Insofar as appellant relies upon Civil Code section 232.1 for her claim that the court "must specify the factual grounds established to support its findings and enter them in the permanent records of the court" (appellant's reply brief p. 2), we note this statute was repealed effective July 1, 1984, which predates the entry of the judgment herein.

We find no reasonable basis for appellant's claims that the trial court failed to distinguish between the individual acts and interests of appellant and Warren or that it erroneously believed if the petition were not granted, the children would be returned to the parents.

Contrary to appellant's second contention, the testimony of her own therapist was itself sufficient to support findings that appellant had neglected or cruelly treated her children in the past and would continue to do so in the future. (*In re Carmaleta B., supra,* 21 Cal.3d at p. 493.)

In addition, of course, child abuse includes not only a parent's own physical abuse of his or her child, but also a failure to protect the child from harm caused by others. (*In re Angelia P., supra,* 28 Cal.3d at p. 924.) Notwithstanding the fact that appellant's three oldest children had reported to their foster parents and therapist that they had been sexually molested by Warren, that appellant herself had advised DPSS of Warren's misconduct and that Warren was ultimately convicted for engaging in such acts, appellant adamantly refused to deal with this issue during therapy and maintained at trial that Warren had never molested any of the children. Although appellant allegedly had been living apart from Warren since his conviction, when asked whether she planned to live with him again in the future, she responded, "I don't know."

Appellant's attitude may well have convinced the court she did not appreciate the necessity of keeping the children apart from Warren and therefore could not be relied upon to live away from him if the children were returned

---

[8]"If a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody, the court *shall consider and give due weight to his wishes in making an award of custody or modification thereof. . . .*" (*In re B.G., supra,* 11 Cal.3d 679, 695; italics added.)

to her care. (*In re Carmaleta B., supra,* at p. 494.) Under the circumstances, the court was amply justified in finding the mother was simply incapable of providing an adequate home for her children in the foreseeable future. (*In re Jacqueline H.* (1979) 94 Cal.App.3d 808, 817 [156 Cal.Rptr. 765].)

▮ Appellant's third contention also fails. Civil Code section 237.5 permits but does not mandate the appointment of independent counsel to represent a minor's interests during the hearing on a petition to free the child from parental custody and control. Of course, if the court finds the child has separate interests not protected in the contest between parents and a petitioner, it must exercise its discretion by appointing separate counsel. (*In re Richard E., supra,* 21 Cal.3d at p. 354.) On the other hand, where, as here, the proceedings are instituted by a public agency on behalf of children who have been dependents of the juvenile court for a number of years, counsel for the agency can adequately represent the children's interests. (*In re Laura F., supra,* 33 Cal.3d at p. 840.) In any event, the failure to appoint separate counsel during such proceedings does not require reversal of the judgment in the absence of a miscarriage of justice (*In re Richard E., supra,* at p. 355), and we perceive nothing in the present record suggesting appellant's children were prejudiced because they were not represented by independent counsel.

▮ In support of her final contention appellant cites four instances in which her counsel allegedly "failed to perform with reasonable competence." (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].) If, in fact, the *Fosselman* standard is appropriately applied in evaluating the effectiveness of counsel in proceedings to terminate parental rights (*In re R.S.* (1985) 167 Cal.App.3d 946, 969 [213 Cal.Rptr. 690]; but see *In re Michael S.* (1981) 127 Cal.App.3d 348, 364 [179 Cal.Rptr. 546]), appellant may not succeed with her claim absent a showing that "it is reasonably probable a determination more favorable to [her] would have resulted in the absence of counsel's failings." (*People* v. *Fosselman, supra,* 33 Cal.3d at p. 584.) This she has failed to do.

Appellant first charges her attorney failed to object to the appointment of a representative of the county counsel's office to represent the interests of her children. Given our conclusion that the children's interests were adequately represented, appellant's counsel cannot be deemed ineffective for this omission.

Appellant next asserts counsel should have requested the trial court to make findings of fact. Assuming such a failure does constitute an omission "significantly affecting [appellant's] rights" (*In re David C.* (1984) 152

Cal.App.3d 1189, 1206, including fn. 9 [200 Cal.Rptr. 115]), a proposition we consider debatable, it is not reasonably probable a result more favorable to appellant would have been arrived at had counsel insisted on such findings.

Appellant also argues counsel should have objected to and moved to strike evidence of Warren's criminal conviction. Apparently appellant's theory in this regard is founded upon the decision in *In re Sonia G.* (1984) 158 Cal.App.3d 18 [204 Cal.Rptr. 498], where the court held parental rights may not be terminated under Civil Code section 232, subdivision (a)(4), unless a felony conviction of the type referred to in that section is final. Nothing in *Sonia G.* suggests that facts relating to a parent's conviction are inadmissible where the petition to declare the child free from parental custody and control is based upon one of the other subdivisions of section 232, as was the case here, at least with respect to appellant.

Finally appellant relies upon counsel's failure to object to the admission of hearsay regarding Mary K.'s allegations that Warren molested the children during visitation. DPSS social worker Martin testified during cross-examination by appellant's counsel that she believed appellant "was a party to the setup that allowed the molestation to take place." Martin relied heavily upon Mary K.'s written account of appellant and Warren's visit with Rebecca and Robin on October 29, 1982, in forming this opinion. In an attempt to convince the trier of fact "[t]here was not one bit of evidence" to support Martin's position that appellant "was somehow instrumental in bringing about the molestation," appellant's counsel asked Martin to read those portions of Mary K.'s letter upon which she had relied. This reflected an informed tactical decision on counsel's part and not a lack of competence.

The judgment is affirmed.

Roth, P. J., and Beach, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 13, 1986.